Nos. 22-5884 & 22-5912

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CHELSEY NELSON PHOTOGRAPHY, LLC; CHELSEY NELSON,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT, ET AL.,

*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court
for the Western District of Kentucky, Louisville Division
Case No. 3:19-cv-00851

CHELSEY NELSON PHOTOGRAPHY, LLC'S AND CHELSEY
NELSON'S OPENING AND RESPONSE (SECOND) BRIEF

Jonathan A. Scruggs
Bryan D. Neihart
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
bneihart@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

*Attorneys for Plaintiffs-Appellees/Cross-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Sixth Circuit Rule 26.1, Chelsey Nelson Photography, LLC and Chelsey Nelson make the following disclosure:

1.     They are not a subsidiary or affiliate of a publicly owned corporation.

2.     There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................i

Table of Authorities ..........................................................................vi

Statement in Support of Oral Argument .....................................................1

Statement of Jurisdiction ......................................................................2

Statement of Issues .............................................................................3

Introduction ....................................................................................4

Statement of the Case ..........................................................................6

I.    Nelson celebrates marriage consistent with her faith
      through photographs and blogs. ........................................................6

II.   Nelson learns about threats to other artists posed by
      Louisville's and other laws.............................................................9

III.  Nelson learns about Louisville's threatening law. .......................................11

IV.   Nelson self-censors to avoid violating Louisville's law.................................13

V.    Nelson files her lawsuit, and two district court judges enjoin
      Louisville's law for violating the First Amendment. .....................................14

Standard of Review .............................................................................16

Summary of the Argument .....................................................................16

Argument .......................................................................................18

I.    Nelson has standing and provided a comprehensive record to
      challenge Louisville's law. .............................................................18

      A.    Nelson has standing because Louisville's law credibly
            threatens and chills her religiously motivated speech.........................18

            1.    Nelson intends to and engages in activities
                  protected by the First Amendment. ...............................19

2.      Louisville's law arguably prohibits Nelson's desired activities. .......................................................21

3.      Nelson deserves a presumption that she faces a credible threat of enforcement. ....................................23

4.      Other factors support the enforcement presumption, bolstering Nelson's standing. ...............27

5.      Louisville's counterarguments impose unnecessary barriers and make standing impossible. ...................................................................30

B.      Nelson brings ripe challenges to Louisville's law because it undisputedly forbids her desired activities. ........34

II.     The Accommodations Provision violates the First Amendment by compelling Nelson to speak against her convictions. ....................................................................35

A.      The Accommodations Provision alters Nelson's speech when she makes editorial decisions. ....................................36

1.      Nelson's photographs and blogs are pure speech. ........36

2.      Louisville's law affects Nelson's speech by forcing her to speak against her conscience. ............................38

B.      The Accommodations Provision violates the First Amendment by compelling Nelson to speak based on content and viewpoint. ...........................................................41

C.      Louisville's approach unsettles established law protecting speaker autonomy. ................................................43

1.      The Accommodations Provision compels Nelson's speech, not her conduct. ................................................43

2.      The Accommodations Provision directly burdens Nelson's speech. ...........................................................45

3.   The Accommodations Provision compels Nelson's speech, not her clients'...................................47

4.   The Accommodations Provision compels Nelson's speech, not her client selection.....................48

D.   Nelson's lines are workable; Louisville's line suppresses speech. .................................................50

III.   The Publication Provision violates the First Amendment by restricting Nelson's speech about protected activities based on content and viewpoint. .............................................52

IV.   The Accommodations and Publication Provisions violate KRFRA because they substantially burden Nelson's religious beliefs. ...........................................................................53

V.   Louisville's law fails strict scrutiny as applied to Nelson. ............55

A.   Louisville lacks a compelling interest in applying its law to Nelson's speech. .........................................56

B.   Louisville has many, less intrusive alternatives to achieve any valid goal. .............................................59

VI.   Professor Barak-Corren's testimony was properly excluded. .......61

A.   Barak-Corren's testimony is unreliable because her study contains structural mistakes........................62

B.   Barak-Corren's testimony is legally irrelevant because she has no information about Nelson or Louisville. ............65

VII.   The supplemental documents are admissible, undisputed, and further bolster Nelson's standing and claims.........................68

VIII.   The Unwelcome Clause facially violates the First and Fourteenth Amendments. ...............................................69

A.   The Unwelcome Clause is overbroad. ...................70

     B.    The Unwelcome Clause is vague and grants Louisville's officials unbridled enforcement discretion ............................ 74

IX.   Nelson's nominal and compensatory damages should be reinstated because she plausibly alleged harm. ............................ 75

Conclusion ................................................................................................ 78

Certificate of Compliance ........................................................................ 80

Certificate of Service ................................................................................ 81

Addendum ................................................................................................ A

## TABLE OF AUTHORITIES

### Cases

*303 Creative LLC v. Elenis,*
    6 F.4th 1160 (10th Cir. 2021)......................................26, 30, 73, 75

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ......................................................................59

*Associated Press v. United States,*
    326 U.S. 1 (1945) ..........................................................................50

*Babbitt v. United Farm Workers National Union,*
    442 U.S. 289 (1979) ......................................................................24

*Barilla v. City of Houston,*
    13 F.4th 427 (5th Cir. 2021)..........................................................76

*Benson v. City of Wellston,*
    201 F. App'x 350 (6th Cir. 2006)...................................................76

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ......................................................................56

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ............................................................. passim

*Brush & Nib Studio, LC v. City of Phoenix,*
    418 P.3d 426 (Ariz. Ct. App. 2018) ..............................................74

*Brush & Nib Studio, LC v. City of Phoenix,*
    448 P.3d 890 (Ariz. 2019) ..............................................26, 44, 54

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ......................................................................55

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ......................................................................58

*City of Cleveland v. Nation of Islam,*
    922 F. Supp. 56 (N.D. Ohio 1995)................................................44

*City of Lebanon v. Goodin,*
    436 S.W.3d 505 (Ky. 2014) ............................................................. 71

*Clark v. Community for Creative Non-Violence,*
    468 U.S. 288 (1984) ........................................................................ 50

*Cohen v. California,*
    403 U.S. 15 (1971) .......................................................................... 57

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.,*
    6 F.4th 1247 (11th Cir. 2021).......................................................... 44

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) ........................................................................ 61

*Department of Fair Employment & Housing v. Cathy's Creations,*
    *Inc.,*
    No. BCV-18-102633 (Cal. Sup. Ct. Oct. 21, 2022).......................... 10

*Doe v. Bolton,*
    410 U.S. 179 (1973) ........................................................................ 24

*Donovan v. FirstCredit, Inc.,*
    983 F.3d 246 (6th Cir. 2020) ........................................................... 71

*Doster v. Kendall,*
    54 F.4th 398 (6th Cir. 2022)...................................................... 24, 54

*Elane Photography, LLC v. Willock.*
    309 P.3d 53 (N.M. 2013).......................................................... 11, 46

*Ellis ex rel. Pendergrass v. Cleveland Municipal School District,*
    455 F.3d 690 (6th Cir. 2006) .................................................... 16, 68

*Emilee Carpenter, LLC v. James,*
    575 F. Supp. 3d 353 (W.D.N.Y. 2021)............................................ 26

*ETW Corp. v. Jireh Publishing, Inc.,*
    332 F.3d 915 (6th Cir. 2003) ............................................... 36, 45, 47

*F.C.C. v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ........................................................................ 74

*FEC v. Cruz,*
    142 S. Ct. 1638 (2022) .............................................................. 20, 31

*FEC v. Wisconsin Right To Life, Inc.,*
    551 U.S. 449 (2007) ........................................................... 35, 53, 56

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) .................................................................... 56

*Gooding v. Wilson,*
    405 U.S. 518 (1972) .................................................................. 70, 72

*Green Party of Tennessee v. Hargett,*
    791 F.3d 684 (6th Cir. 2015) ......................................................... 24

*Green v. Miss United States of America, LLC,*
    52 F.4th 773 (9th Cir. 2022) .......................................................... 44

*Groswirt v. Columbus Dispatch,*
    No. 00-3451, 2000 WL 1871696 (6th Cir. 2000) ........................... 44

*Hill v. Snyder,*
    878 F.3d 193 (6th Cir. 2017) ......................................................... 70

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ........................................................................... 44

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995) ............................................................... passim

*Hyman v. City of Louisville,*
    53 F. App'x 740 (6th Cir. 2002) ..................................................... 32

*In re Scrap Metal Antitrust Litigation,*
    527 F.3d 517 (6th Cir. 2008) ......................................................... 16

*Irish-American Gay, Lesbian & Bisexual Group of Boston v. City of
    Boston,*
    636 N.E.2d 1293 (Mass. 1994) ...................................................... 45

*Janus v. American Federation of State, County, & Municipal Employees, Council 31*,
138 S. Ct. 2448 (2018) ............................................................ 36, 74

*Johari v. Ohio State Lantern*,
No. 95-3421, 1996 WL 33230 (6th Cir. 1996) ................................ 44

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) ........................................................ 25

*Kiser v. Reitz*,
765 F.3d 601 (6th Cir. 2014) ....................................................... 33

*Klein v. Oregon Bureau of Labor & Industries*,
410 P.3d 1051 (Or. Ct. App. 2017) ............................................... 11

*Kolender v. Lawson*,
461 U.S. 352 (1983) ..................................................................... 74

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) ....................................................... 54

*Lexington-Fayette Urban County Human Rights Commission v. Hands On Originals*,
592 S.W.3d 291 (Ky. 2019) .......................................................... 10

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..................................................................... 24

*Mannarino v. Cut the Cake Bakery*,
No. 16–3465, 2017 WL 601408 (Fl. Div. of Admin. Hr'gs Feb. 9, 2017) ............................................................................. 52

*Maryville Baptist Church, Inc. v. Beshear*,
957 F.3d 610 (6th Cir. 2020) ................................................. 54, 55

*Masterpiece Cakeshop Inc. v. Elenis*,
445 F. Supp. 3d 1226 (D. Colo. 2019) .......................................... 11

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
138 S. Ct. 1719 (2018) ........................................................... 11, 67

ix

*McCullen v. Coakley,*
 573 U.S. 464 (2014) ...............................................................59, 60

*McGlone v. Bell,*
 681 F.3d 718 (6th Cir. 2012) ....................................16, 76

*McKay v. Federspiel,*
 823 F.3d 862 (6th Cir. 2016) ....................................27, 30

*MedImmune, Inc. v. Genentech, Inc.,*
 549 U.S. 118 (2007) ...............................................................33

*Miami Herald Publishing Company v. Tornillo,*
 418 U.S. 241 (1974) .........................................................41, 42, 47

*Miami Valley Fair Housing Center, Inc. v. Connor Group,*
 725 F.3d 571 (6th Cir. 2013) .........................................73

*Michigan State Chamber of Commerce v. Austin,*
 788 F.2d 1178 (6th Cir. 1986) .........................................30

*Morrison v. Board of Education of Boyd County,*
 521 F.3d 602 (6th Cir. 2008) ....................................76, 77

*NAACP v. Button,*
 371 U.S. 415 (1963) ...............................................................21

*New York State Club Association, Inc. v. City of New York,*
 487 U.S. 1 (1988) ...............................................................26

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
 142 S. Ct. 2111 (2022) ...............................................................55

*NIFLA v. Becerra,*
 138 S. Ct. 2361 (2018) ...............................................................50

*Online Merchants Guild v. Cameron,*
 995 F.3d 540 (6th Cir. 2021) .........................................27

*Pacific Gas & Electric Company v. Public Utilities Commission of
California,*
 475 U.S. 1 (1986) .........................................................41, 43, 47, 55

*Peoples Rights Organization, Inc. v. City of Columbus*,
    152 F.3d 522 (6th Cir. 1998) ........................................................... 30

*Planned Parenthood Association of Cincinnati, Inc. v. City of
    Cincinnati*,
    822 F.2d 1390 (6th Cir. 1987) ........................................................ 24

*Platt v. Board of Commissioners on Grievances & Discipline of Ohio
    Supreme Court*,
    769 F.3d 447 (6th Cir. 2014) ................................................... 24, 29

*Plunderbund Media, L.L.C. v. DeWine*,
    753 F. App'x 362 (6th Cir. 2018) ..................................................... 25

*Ramirez v. Collier*,
    142 S. Ct. 1264 (2022) ..................................................................... 59

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ................................................................... 41, 55

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988) .......................................................................... 42

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995) .......................................................................... 42

*Rumsfeld v. Forum for Academic & Institutional Rights*,
    547 U.S. 47 (2006) ..................................................................... 45, 46

*Saxe v. State College Area School District*,
    240 F.3d 200 (3d Cir. 2001).............................................................. 73

*Scardina v. Masterpiece Cakeshop, Inc.*,
    2023 COA 8........................................................................................ 11

*Sistrunk v. City of Strongsville*,
    99 F.3d 194 (6th Cir. 1996) ....................................................... 36, 51

*Six Star Holdings, LLC v. City of Milwaukee*,
    821 F.3d 795 (7th Cir. 2016) ........................................................... 76

*Steffel v. Thompson*,
415 U.S. 452 (1974) ...................................................................33

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ............................................................ passim

*Telescope Media Group v. Lucero*,
936 F.3d 740 (8th Cir. 2019) ................................................. passim

*United States v. Murdock*,
398 F.3d 491 (6th Cir. 2005) .......................................................69

*United States v. Playboy Entertainment Group, Inc.*,
529 U.S. 803 (2000) ....................................................................59

*United States v. Williams*,
553 U.S. 285 (2008) ....................................................................70

*Universal Life Church Monastery Storehouse v. Nabors*,
35 F.4th 1021 (6th Cir. 2022) .....................................................24

*Updegrove v. Herring*,
No. 20-cv-1141, 2021 WL 1206805 (E.D. Va. Mar. 30, 2021) ........26

*Uzuegbunam v. Preczewski*,
141 S. Ct. 792 (2021) ............................................................76, 77

*Virginia v. American Booksellers Association, Inc.*,
484 U.S. 383 (1988) ....................................................................23

*Washington v. Arlene's Flowers, Inc.*,
441 P.3d 1203 (Wash. 2019).......................................................11

*Whole Woman's Health v. Jackson*,
141 S. Ct. 2494 (2021) .................................................................24

*Whole Woman's Health v. Jackson*,
142 S. Ct. 522 (2021) ............................................................24, 25

*Winter v. Wolnitzek*,
834 F.3d 681 (6th Cir. 2016) .......................................................34

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ................................................................41, 47

## Statutes

28 U.S.C. § 1291.........................................................................2

42 U.S.C. § 2000a......................................................................60

Fla. Stat. § 760.02.....................................................................60

K.R.S. § 344.230.......................................................................13

K.R.S. § 344.450.......................................................................13

K.R.S. § 446.350........................................................53, 54, 56

Metro Ord. § 111.01..................................................................60

Metro Ord. § 137.03..................................................................60

Metro Ord. § 156.052................................................................60

Metro Ord. § 92.02....................................................................28

Metro Ord. § 92.05...........................................................passim

Metro Ord. § 92.08.................................................12, 13, 29

Metro Ord. § 92.09.............................................12, 13, 28, 32

Metro Ord. § 92.10....................................................................12

Metro Ord. § 92.11....................................................................12

Miss. Code § 11-62-5................................................................60

Utah Code Ann. § 34A-5-111...................................................60

## Other Authorities

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation
    of Legal Texts* (2012).........................................................71

Creighton Meland & Stephen Cranney, *Measuring and Evaluating Public Responses to Religious Rights Rulings*, 23 Fed. Soc'y Rev. 333 (2022) ................................................................. 65

Eugene Volokh, *Bans on Political Discrimination in Places of Public Accommodation and Housing*, 15 NYU J.L. & Liberty 490 (2022) ................................................................................... 51

Kayla Phelps, *Former UK vendor accused of discriminating against organizers of Lexington gay pride festival*, Kentucky Kernel (Mar. 28, 2012), https://bit.ly/3xh4U1G ......................................... 10

Mayor Greg Fischer (@GregFischerLou), Twitter (Aug. 30, 2022, 6:55 PM), https://bit.ly/4011tJz .............................................. 28

Richard Wolf, *Same-sex marriage foes stick together despite long odds*, USA Today (Nov. 15, 2017), https://bit.ly/3m2czwk ........... 11

## **Rules**

Fed. R. Civ. P. 56 ................................................................... 68

Fed. R. Evid. 201 ................................................................... 68

Fed. R. Evid. 702 ................................................................... 62

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellees/Cross-Appellants Chelsey Nelson Photography, LLC and Chelsey Nelson (Nelson) respectfully request oral argument. Nelson tells stories about marriage consistent with her faith through her wedding photographs and blog posts on her studio's website. But Appellants/Cross-Appellees Louisville-Jefferson County, KY Metro Government and Louisville and Jefferson County Human Relations Commission-Enforcement (Louisville) use their public-accommodations law to force Nelson to promote a different message about marriage and to chill her desired message in her photographs and on her studio's website. That unconstitutionally regulates Nelson's speech and violates her conscience. The district court agreed, enjoined this application of Louisville's law, and declared the law to violate Nelson's rights under the First Amendment and Kentucky Religious Freedom Act (KRFRA).

This case raises critical questions about free speech and religious exercise in the public sphere and how to balance these rights against anti-discrimination laws. Oral argument will help the court decide these fundamentally important issues.

## STATEMENT OF JURISDICTION

Nelson agrees with Louisville's Statement of Jurisdiction. This Court has jurisdiction over Nelson's cross-appeal for those same reasons since this appeal follows a final judgment. 28 U.S.C. § 1291. Nelson timely cross-appealed on October 10, 2022.

## STATEMENT OF ISSUES

Nelson creates wedding photographs and writes blogs consistent with her faith and wants to publicly explain this choice. She challenged Louisville's law because it (1) required her to create expression contrary to her conscience; (2) banned her faith-based editorial policy; and (3) forbid her from telling clients why she celebrates only opposite-sex marriage. The district court found that Nelson has standing and Louisville's law violates her rights. The issues are:

1.      Whether the district court correctly held that Nelson has standing to challenge Louisville's law, that Nelson's claims are ripe, and that Louisville's law violates the First Amendment and KRFRA because the law requires Nelson to create photographs and blog posts celebrating a view of marriage contrary to her conscience and by restricting her speech about marriage.

2.      Whether the summary-judgment record should include relevant, admissible, and undisputed supplemental materials.

3.      Whether the law's Unwelcome Clause is facially overbroad, vague, or allows unbridled discretion when it bans communications indicating someone is "objectionable, unwelcome, unacceptable, or undesirable" at public accommodations because of protected traits.

4.      Whether Nelson may allege and recover nominal and compensatory damages for her loss of constitutional freedoms and business caused by Louisville's law.

# INTRODUCTION

Like many Americans, Chelsey Nelson wants the freedom to speak ideas she believes in and to work consistent with her values. Because she is a wedding photographer and a Christian, Nelson creates photographs and blogs that honor her religious views—including that marriage between a man and woman beautifully displays Jesus' love for His bride, the Church. Nelson gladly creates this expression *for anyone*; she just cannot promote contrary views *for anyone*.

But Louisville interprets its public-accommodations law to compel Nelson to celebrate same-sex marriage in her photographs and blogs. This law also prohibits Nelson from publicly explaining why she creates consistent with her religious beliefs on marriage. That puts Louisville at odds with Nelson—and the First Amendment and KRFRA.

Nelson saw officials across the country use laws to punish artists like her. When she learned of Louisville's similar law, she realized her need to act. So she asked the courts for help. For three years since, Louisville has espoused its compelling need and unchecked authority to regulate Nelson.

This history, the undisputed facts, and Louisville's admissions make this case straightforward. Nelson's photographs and blogs are speech, and Louisville's law seeks to alter their content—from celebrating a view of marriage Nelson wholeheartedly supports to one she religiously opposes. That's compelled speech. And it is

unconstitutional. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995). Below, two different district court judges and the United States government agreed. Orders, RR.47, 130; Statement of Interest, R.38. So have many other courts in indistinguishable cases.

Now, Louisville grasps for straws to avoid this conclusion. First (and incredibly), Louisville denies any threat posed by its law even while characterizing Nelson's beliefs as "discriminatory" and consistently conceding that its law applies to her, compels and restricts her speech, and tolerates no exceptions. Then, Louisville insists that its law only regulates Nelson's conduct while simultaneously seeking to commandeer her camera and website to proclaim a view of marriage she opposes. Finally, Louisville claims this authority with no evidence whatsoever to justify this violation of Nelson's freedoms.

Louisville's arguments nullify the First Amendment, silence disfavored speech, "excise[] certain ideas or viewpoints from the public dialogue," and threaten to expose all artists to censorship by converting them into "minor official[s] working on themes handed down from above." Order, R.130, PageID#5374–5375 (cleaned up). Meanwhile, protecting Nelson's speech fulfills the First Amendment's foundational promise: promoting tolerance and respect for all views, even when we disagree.

This Court should affirm the district court's decision with the addition of the supplemental records, order a facial injunction of the

5

Unwelcome Clause, and remand to the district court to enter Nelson's
requested nominal damages and determine her compensatory damages.

## STATEMENT OF THE CASE

### I.    Nelson celebrates marriage consistent with her faith through photographs and blogs.

Nelson's passion for photography began as a little girl when she
coped with a devastating family loss by looking through family photo
albums. Nelson Decl. ¶¶13–19, R.92–2, PageID#2835. That passion
blossomed and eventually led Nelson to start her own photography
studio. *Id.* at ¶¶20–74, PageID#2835–2841. Nelson always desired to
"tell[] positive stories through photography, editing, and writing about
weddings between a man and a woman." *Id.* at ¶76, PageID#2841. Her
religious beliefs informed that choice. She believes God designed
marriage as the union of one man and one woman. *Id.* at ¶¶75–124,
PageID#2841–2846. Nelson hopes to use her studio to publicly advocate
that view. *Id.*; *id.* at ¶¶305–06, PageID#2867–2868.

To that end, Nelson offers two services: (1) boutique editing
services for weddings and commercial photographers, and (2) wedding-
celebration services (photography and blogging) for engagements and
weddings. *Id.* at ¶¶151–207, PageID#2848–2854. For both forms of
expression, Nelson retains ultimate artistic control and exercises her
artistic judgment in many ways, as shown by her engagement and
wedding photographs below. Nelson's Photographs, R.92-6-7,

PageID#3105–3180, 3184–3196; Nelson Booklet, R.92–6, PageID#3029–3102; Nelson Dep., R.92–7, PageID#3306–3324; Contracts, R.92–6, PageID#3015–3028.



Nelson's wedding-celebration service always includes a blog post on her website and always covers the engagement and the wedding. Nelson Decl. ¶¶268–92, R.92–2, PageID#2862–2866; Contract, R.92–6, PageID#3015–3021. Nelson's blog is integral to her business because it

allows her to publicly advocate her view of marriage. Nelson Decl.
¶¶268–92, R.92–2, PageID#2862–2866. Nelson decides the content of
the blog too as shown by the excerpt below. Nelson Blogs, R.92–5-6,
PageID#2937–2993.

> It was an honor to spend the day documenting such a sacred occasion
> with Parker and Larissa as they made a covenant before God, their
> friends, and family. The ceremony honored God's design for marriage
> and a desire for this marriage to point others to the love of Jesus.

Just as her faith guides what she promotes, it also affects what
she cannot photograph or blog about. Nelson Decl. ¶¶328–94, R.92–2,
PageID#2872–2880. Nelson evaluates each request based on the
message the requested artwork promotes. *E.g.*, *id.* at ¶409,
PageID#2882. Because of her religious beliefs, Nelson does not provide
photography services that demean others, praise vulgarity, or
contradict biblical principles. *Id.* at ¶333–34, PageID#2873. For
example, Nelson would not provide photography services for opposite-
sex weddings with a Game of Thrones theme. *Id.* at ¶¶328–76,
PageID#2872–2878. Likewise, because Nelson sees marriage as the
union of one man and one woman, she cannot create photographs or
blogs celebrating polygamous or same-sex marriage. *Id.* at ¶¶377–94,
PageID#2878–2880.

Nelson's decisions always turn on the *what*, not the *who*—what
messages she's being asked to create, not who asks. *Id.* at ¶¶395–409,

PageID#2880–2882. To illustrate, Nelson would edit opposite-sex wedding photographs for an LGBT photographer, edit photographs for an LGBT-owned business, and provide wedding-celebration services for an opposite-sex wedding if hired by an LGBT wedding planner, parent, or family member. *Id.* But Nelson would not photograph a staged same-sex wedding even if the models were heterosexual. *Id.*

## II.    Nelson learns about threats to other artists posed by Louisville's and other laws.

Before Nelson started her studio, she knew other public-accommodations laws were threatening and punishing artists because of their beliefs about marriage and other topics. Nelson Decl. ¶¶410–412, R.92–2, PageID#2882. Nelson worried that she faced similar threats and potential penalties, *id.* at ¶413, PageID#2882, and with good reason. In an official newsletter, a Louisville commission member slandered individuals who request religious exemptions as "the new face of discrimination." Compl. ¶308, R.1, PageID#39.

Previously, Louisville investigated Teen Challenge of Kentucky, Inc., a faith-based organization that helps men and women overcome substance abuse issues. Case File, R.129–2, PageID#5346. The investigation began when the Lexington Fair Housing Council—a nonprofit advocacy organization—filed a public-accommodations complaint after seeing the ministry's religious views on homosexuality in news articles. *Id.* at PageID#5306–5307, 5321, 5326–5331.

9

Likewise, Louisville's enforcement commission launched a complaint against Scooter's Triple B's—a Louisville restaurant—for a sign after it caused angry social-media reactions. Boyd Dep., R.92–7, PageID#3662, 3725; Case File, R.129–1, PageID#5268–5305. The sign expressed the restaurant owners' views "on a matter of public concern"—restroom access by those who identify as transgender. *Id.* at PageID#5292–5295. Louisville admitted the sign contained "political speech" but claimed the authority to ban the sign as "fighting words." *Id.* at PageID#5276–5279. The restaurant removed the sign to end prosecution. *Id.* at PageID#5300–5301.

Elsewhere in Kentucky, city officials prosecuted a custom t-shirt printer for declining to design a t-shirt promoting a message contrary to the owner's beliefs about marriage and sexuality. *Lexington-Fayette Urban Cnty. Hum. Rts. Comm'n v. Hands On Originals*, 592 S.W.3d 291, 295 (Ky. 2019). The negative publicity from the complaint alone cost the designer more than $200,000. Kayla Phelps, *Former UK vendor accused of discriminating against organizers of Lexington gay pride festival*, Kentucky Kernel (Mar. 28, 2012), https://bit.ly/3xh4U1G.

Beyond Kentucky, state officials have prosecuted photographers and other artists for declining to design custom works that contradict their beliefs about marriage. *Dep't of Fair Emp. & Hous. v. Cathy's Creations, Inc.*, No. BCV-18-102633 (Cal. Sup. Ct. Oct. 21, 2022), *available at* https://bit.ly/3UJl2Dq; *Washington v. Arlene's Flowers,*

*Inc.*, 441 P.3d 1203, 1210–12 (Wash. 2019); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n* (*Masterpiece*), 138 S. Ct. 1719, 1724–26 (2018); *Masterpiece Cakeshop Inc. v. Elenis*, 445 F. Supp. 3d 1226, 1236–37 (D. Colo. 2019); *Scardina v. Masterpiece Cakeshop, Inc.*, 2023 COA 8; *Klein v. Or. Bureau of Lab. & Indus.*, 410 P.3d 1051, 1057 (Or. Ct. App. 2017); *Elane Photography, LLC v. Willock*, 309 P.3d 53 (N.M. 2013).

These prosecutions have had devastating consequences—including heavy business losses, fines of over \$100,000, and "death threats." Richard Wolf, *Same-sex marriage foes stick together despite long odds*, USA Today (Nov. 15, 2017), https://bit.ly/3m2czwk.

## III.  Nelson learns about Louisville's threatening law.

Nelson feared these results. Nelson Decl. ¶¶412–510, R.92–2, PageID#2882–2894. But she didn't know the threat against her until October 2018 when she learned about Louisville's law. *Id.*

This law has two clauses, the Accommodations Provision and the Publication Provision. The former forbids public accommodations from denying someone "the full and equal enjoyment" of goods, services, and accommodations because of "sexual orientation." Metro Ord. § 92.05(A). The latter makes it illegal for public accommodations to "publish" or "display" a "communication" which "indicates" that (A) "services" will be "denied" because of someone's "sexual orientation" (the Denial Clause) or (B) someone's "patronage of, or presence at" a business is "objection-

able, unwelcome, unacceptable, or undesirable" because of "sexual orientation" (the Unwelcome Clause). Metro Ord. § 92.05(B).

Nelson's studio is a public accommodation. *Infra* § I.A.2. As applied to her, Louisville's law (1) forces Nelson to create photographs and blogs celebrating same-sex weddings because she does so for opposite-sex weddings; (2) prohibits her policy of celebrating only opposite-sex weddings; and (3) forbids her from communicating her editorial statement explaining her choices and views to the public. *Id.*

Nearly anyone can file complaints under Louisville's law, including individuals, private testers, nonprofit advocacy organizations, Louisville's own officials, and Louisville's employed testers. *Infra* § I.A.4. To complain, an "aggrieved" person need not be denied a service. Simply seeing an objectionable sign or online post can trigger a complaint. *Infra* § I.A.4–.5.

Louisville must investigate all complaints. Metro Ord. § 92.09(C)–(D); Boyd Aff., R.97–9, PageID#4012. This burdensome investigation requires respondents to file responses under oath, produce documents, and give testimony. Metro Ord. §§ 92.08(B)(4)–(5)–.09(D). Respondents unwilling to participate are subject to default judgments. *Id.* at § 92.11.

Louisville then determines whether there is "reasonable cause" to believe a violation occurred. *Id.* at § 92.09(E). If so, Louisville either settles the complaint or proceeds to a hearing. *Id.* at 92.09–.10. After that hearing, Louisville can issue "cease and desist" orders, impose

uncapped fines, force public accommodations to provide the requested service, mandate compliance reports, and require "anti-discrimination training." *Id.* at § 92.08(B)(8) (incorporating K.R.S. § 344.230); Goatley Aff., R.64–3, PageID#1653–1654. These remedies plus damages and attorney fees are available to complainants who file directly in state court. Metro Ord. § 92.09(A) (incorporating K.R.S. § 344.450).

## IV.   Nelson self-censors to avoid violating Louisville's law.

Before learning about Louisville's law, Nelson was actively growing her business. She signed up for photography-business classes, followed wedding photographers on social media, listened to podcasts, read other resources, and joined a photography referral group. Nelson Decl. ¶¶416–426, R.92–2, PageID#2883–2884. But that changed when she realized how Louisville's law affected and threatened her studio.

Nelson then understood that her decision to only photograph and blog about opposite-sex weddings—and her policy binding her studio to that choice—violated Louisville's law. *Id.* at ¶456, PageID#2888. So she sought to avoid prosecution. She left the photography referral group, posted less on social media, and reduced her contact with her professional network to limit her exposure to objectionable requests. *Id.* at ¶¶430–49, PageID#2884–2887.

Nelson also wanted to be honest and transparent with prospective couples by publishing on her website or telling them about her reasons

for promoting marriages only between one man and one woman. *Id.* But she refrained from posting a "comprehensive expression of [her] religious beliefs about God designing marriage to be the union of one man and one woman" for fear of being investigated and prosecuted. *Id.* at ¶¶445–54, PageID#2886–2887. She hoped to post and communicate these beliefs to prospective couples to persuade others to her viewpoint. *Id.* at ¶444, PageID#2886.

But Nelson couldn't continue to chill and hinder her religiously motivated expression—i.e., to create photographs, write blogs, and operate her studio to publicly proclaim her beliefs about God's design for marriage. *Id.* at ¶¶75–99, 208–14, 305–06, PageID#2841–2844, 2854–2855, 2867–2868. Nor could she continue to live under the constant threat posed by Louisville's laws. *Id.* at ¶¶492–508, PageID#2892–2893. This rock-and-a-hard place choice forced Nelson to file this lawsuit to protect her freedom of expression.

## V.  Nelson files her lawsuit, and two district court judges enjoin Louisville's law for violating the First Amendment.

Nelson's complaint sought declaratory and injunctive relief to prevent Louisville from violating her constitutional and KRFRA rights and compensatory and nominal damages to redress her past injuries. Compl. Prayer for Relief ¶¶1–10, R.1, PageID#50–51.

Nelson also moved for a preliminary injunction. Order, R.47, PageID#1202. The district court granted it after concluding that Nelson

14

had standing, her claims were ripe, and Louisville's law likely violated her free-speech rights. *Id*. at PageID#1207–1225. But the court dismissed Nelson's damage claims without prejudice based on Louisville's motion to dismiss. *Id*. at PageID#1211.

The parties proceeded to discovery where Nelson successfully moved to compel Louisville to produce various documents. Order, R.89, PageID#2186–2219.

The parties then cross-moved for summary judgment. Order, R.130, PageID#5358. Nelson requested a permanent injunction and declaratory judgment. *Id*. Louisville offered Professor Netta Barak-Corren as an expert. *Id*. at PageID#5383–5387. Nelson offered George Yancey, Ph.D. in rebuttal. Yancey Report, R.90–6, PageID#2412–2440. Long afterwards, Louisville finished producing the ordered discovery documents. Order, R.127, PageID#5183.

At summary judgment, the district court found standing and ripeness and granted Nelson's summary-judgment motion. Order, R.130, PageID#5353–5396. The court enjoined Louisville from violating Nelson's free-speech rights by compelling her to photograph and blog about same-sex weddings or by restricting her speech on that topic, and declared the law violated KRFRA by substantially burdening Nelson's religious freedom. Order, R.130, PageID#5396. The court further held that Louisville's law failed strict scrutiny as applied to Nelson and excluded Barak-Corren's testimony as unreliable and irrelevant. *Id*. at

PageID#5377–5387. The court declined to facially enjoin the Unwelcome Clause and denied as moot Nelson's motion to supplement the summary-judgment record. *Id.*; Text Order, R.131.

Louisville appealed. Nelson cross-appealed.

## STANDARD OF REVIEW

Nelson agrees that a de novo standard of review applies to standing, ripeness, and summary judgment. This standard also applies to the cross-appealed issues about the Unwelcome Clause's facial validity, the refusal to consider supplemental evidence, and the dismissal of Nelson's damages claims at the motion-to-dismiss stage. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 698 (6th Cir. 2006) (evidence); *McGlone v. Bell*, 681 F.3d 718, 731 (6th Cir. 2012) (damages).

The abuse-of-discretion standard applies to expert exclusions, but it is higher than Louisville suggests. This Court must have a "definite and firm conviction that the district court committed a clear error of judgment." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (cleaned up).

## SUMMARY OF THE ARGUMENT

Nelson desires to promote a view of marriage consistent with her religious beliefs through her photography and blogs. She also wants to explain that choice to the public to persuade them of her views. But

Louisville argues this is illegal, seeks to alter the content of Nelson's expression, and threatens to prosecute if Nelson continues operating her studio according to her beliefs.

That clear conflict and credible threat give Nelson standing and present a ripe case. *Infra* § I. Louisville's interpretation of its law violates Nelson's First Amendment and KRFRA rights by forcing her to celebrate same-sex weddings through her photography and blogs, by restricting her religious views, and by threatening her with penalties for adhering to her beliefs about marriage. *Infra* §§ II–IV.

For these reasons, Louisville's law must pass strict scrutiny. But Louisville did not meet this demanding standard. *Infra* § V. Professor Barak-Corren's testimony doesn't show otherwise because her testimony is unreliable and legally irrelevant. *Infra* § VI. The district court correctly reached these same conclusions and rightly enjoined Louisville and declared its law violates Nelson's KRFRA rights. Order, R.130, PageID#5359–5396.

Additionally, this Court should consider Nelson's supplemental documents because Louisville produced them and they offer even more evidence supporting Nelson's case. *Infra* § VII. The Unwelcome Clause should be facially enjoined as overbroad, vague, and granting unbridled enforcement discretion. *Infra* § VIII. And Nelson's damages claims should be reinstated because Nelson chilled her speech and lost business as a result of Louisville's law. *Infra* § IX.

Nelson asks this Court to affirm the district court's injunction and declaration, notice the supplemental materials, permanently enjoin the Unwelcome Clause facially, and order the district court to enter Nelson's nominal damages and calculate her compensatory damages.

## ARGUMENT

### I. Nelson has standing and provided a comprehensive record to challenge Louisville's law.

Nelson has standing and her claims are ripe. Order, R.130, PageID#5359–5365. Standing requires a showing of injury-in-fact, causation, and redressability. *Susan B. Anthony List v. Driehaus* (*SBA List*), 573 U.S. 149, 157 (2014). Nelson must also show ripeness. *Id.* at 157 n.5. Louisville only contests injury-in-fact and ripeness. But Nelson can show these because (A) Louisville's law credibly threatens her, and (B) the record supplies more than enough facts for ripe review.

#### A. Nelson has standing because Louisville's law credibly threatens and chills her religiously motivated speech.

For injury-in-fact, Nelson need only prove a "substantial risk" of Louisville's law harming her. *SBA List*, 573 U.S. at 158. Nelson does so because she meets the Supreme Court's three-part test for pre-enforcement standing: (1) she intends "to engage in a course of conduct arguably affected with a constitutional interest"; (2) her activities are arguably "proscribed by" Louisville's law; and (3) she faces a "credible

18

threat of prosecution." *Id.* at 159. What's more, (4) other factors bolster Nelson's standing, and (5) Louisville's counter-arguments fail.

### 1.    Nelson intends to and engages in activities protected by the First Amendment.

Nelson engages in activities affected with a constitutional interest. She offers and creates photographs and blogs celebrating a view of marriage consistent with her faith, and she adopted and follows a policy to that effect. *Infra* § II–IV; Operating Agreement, R.92–5, PageID#2907–2908; Nelson Decl. ¶¶51–54, 76, 151–73, R.92–2, PageID#2838–2839, 2841, 2848–2850. Nelson also wanted to post statements explaining her reasons for her artistic choices, but had refrained to avoid prosecution. *Id.* at ¶¶439–54, PageID#2885–2887. Since the preliminary injunction, Nelson has posted those explanations on her website. *Id.* at ¶475, PageID#2890; Website Statements, R.92–5, PageID#2931, 2933.

Despite this undisputed evidence, Louisville says this case is "manufactured." Metro.Br.14. But Louisville offers no evidentiary support. Nelson's verified complaint, multiple declarations, and testimony unwaveringly support her intent and actual practice. At most, Louisville complains that Nelson received "legal advice" before posting her statements. Metro.Br.8. But that was because she faced a credible threat of being prosecuted for those statements. *See* § I. And no

one disputes that *Nelson* drafted the statements to express her beliefs. Nelson Dep., R.97–7, PageID#3990.

Regardless, the Supreme Court has routinely rejected Louisville's exact argument, both recently and in 1960s civil-rights cases. *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022) (rejecting argument that plaintiffs lack standing "for injuries" they "purposely incur[]"); Order, R.130, PageID#5363 n.5 (citing civil-rights case that helped end segregation). Louisville ignores these cases.

Louisville next bemoans that Nelson "was scaling back her photography business" before the lawsuit. Metro.Br.9. But as Louisville acknowledges, "scaling back" means Nelson focused "exclusively on wedding photography." *Id*. That's unsurprising. Nelson wanted to do that "[f]rom the outset" of her business. Nelson Decl. ¶76, R.92–2, PageID#2841. And she became a new mom during this time too. *Id.* at ¶¶121–24, PageID#2846. Louisville thinks Nelson forfeited her right to seek judicial relief by becoming a mother. Order, R.130, PageID#5363 (Louisville "seemingly question[s] Nelson's decision to work part-time after having a child."). Not so. Since the injunction, Nelson has continued to photograph, edit, and blog about weddings consistent with her faith, maintained a policy to that effect, posted her statements, grown her business, created an online tutorial, and continued to receive requests and book new clients. Nelson Decl. ¶¶478–509, R.92–2,

PageID#2890–2894; Website Statements, R.92–5, PageID#2931, 2933; Nelson Supp. Decl. ¶¶3–4, R.104–1, PageID#4584.

Finally, Louisville criticizes Nelson's counsel for "a national strategy" of preserving "religious exemptions." Metro.Br.20. To repeat: Louisville impugns Nelson for her counsel supporting people's constitutional rights. But such public advocacy is constitutionally protected. *NAACP v. Button*, 371 U.S. 415, 429–45 (1963). Meanwhile, Louisville ignores both how governments have fined and ruined businesses that share Nelson's beliefs and its own position of denying *any* "religious exemptions." Metro.Br.3–4, 44. Louisville's criticisms are a non-starter and cannot refute Nelson's undisputed intent.

### 2. Louisville's law arguably prohibits Nelson's desired activities.

Louisville admits that its law regulates Nelson's studio as a public accommodation and that her activities violate the law. Defs.' Admissions, R.104–4, PageID#4596.

Louisville's law requires Nelson to offer and create photographs and blogs "on the exact same terms and conditions" for same-sex and opposite-sex weddings. Defs.' Interrogatory Responses, R.92–7, PageID#3288; Metro.Br.28, 34. According to Louisville, Nelson violates the law because she only creates photographs and writes blogs celebrating opposite-sex weddings and doesn't offer those "exact same services" to celebrate same-sex weddings. Defs.' Admissions, R.92–7,

PageID#3257–3259; 30(b)(6) Dep., R.92–7, PageID#3665–3667; Defs.'
MPI Resp., R.15–1, PageID#783 (services must be "equally available");
Defs.' MSJ, R.97, PageID#3830 (same). Nelson would likewise violate
the law by offering "lesser quality" of photographs and blogs for same-
sex weddings. 30(b)(6) Dep., R.92–7, PageID#3667.

Louisville also prohibits Nelson from following her current policy
and practice of only photographing, editing, and blogging about
opposite-sex weddings. *See, e.g.*, Defs.' Admissions, R.92–7,
PageID#3261–3264. Louisville's official representative testified "[i]f
that's her policy … then yes, that is discrimination." 30(b)(6) Dep.,
R.92–7, PageID#3668.

Louisville's law even bans Nelson's written and verbal statements
to prospective customers explaining why she can only promote certain
messages about marriage. Defs.' Admissions, R.92–7, PageID#3265–
3267, 3333–3334; Answer ¶17, R.104–4, PageID#4592. The Unwelcome
Clause also arguably bans Nelson from explaining her religious beliefs
on marriage because some might view those beliefs as "unwelcom[ing]."
Metro Ord. § 92.05(B).

Louisville's briefing confirms all this:

- Nelson's "business model is discriminatory," her policy is
  "plainly discriminatory," and her statements "discriminate[]
  against same-sex couples." Defs.' MPI Resp., R.15–1,
  PageID#769, 772, 774;

22

- Nelson's "conduct and certain language in [her] marketing statement violate[] the Fairness Ordinance." Defs.' Mot. for Protective Order, R.64, PageID#1609;

- Nelson's activities are "undisputed violations of Louisville Metro's antidiscrimination law." Defs.' MSJ, R.97, PageID#3821;

- Nelson seeks "the freedom to discriminate." Defs.' MSJ Reply, R.111, PageID#4797; and

- Nelson's "objection to photographing same-sex weddings is … because she wants to discriminate against customers based on their sexual orientation." Defs.' Resp. to Mot. to Suppl., R.120, PageID#5127.

That's just a sample. *See also* Metro.Br.28, 30–32, 38, 40–41, 52. Nelson's desired activities *at least arguably* violate Louisville's law.

### 3.    Nelson deserves a presumption that she faces a credible threat of enforcement.

Nelson faces a presumptive credible threat of enforcement because her studio is an object of Louisville's law, the law arguably proscribes her desired activities, and Louisville never disavows despite actively enforcing the law. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (standing when court found "no reason to assume" a "newly enacted law will not be enforced"); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir.

1987) (standing where "statutory language of the Ordinance" applied to plaintiff).[1] When plaintiffs are "an object of the action" at issue "there is ordinarily little question that the action or inaction has caused [their] injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). The Supreme Court and this Court recently applied this presumption in two pre-enforcement cases.

In *Whole Woman's Health v. Jackson*, abortion providers challenged a law fearing that licensing officials might enforce it against them—even though the law had not gone into effect, licensing officials had never enforced it against anyone, and state officials explicitly disavowed the feared application. 142 S. Ct. 522, 530, 537 (2021); *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (noting Texas disclaimed "executive employees … authority to enforce the Texas law

---

[1] *E.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (standing when law "directly operate[d]" against abortion providers who had never been threatened with prosecution); *Doster v. Kendall*, 54 F.4th 398, 416–26 (6th Cir. 2022) (standing to challenge vaccine requirements before servicemembers received formal denials); *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022) (standing where law prohibited ministers from solemnizing weddings and state never disavowed); *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 695 (6th Cir. 2015) (standing where loyalty oath affidavits applied to minority political parties and government never disavowed); *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 451 (6th Cir. 2014) (Courts "do not closely scrutinize the plaintiff's complaint for standing" in First Amendment cases.).

either directly or indirectly"). The Supreme Court still found standing because officials could enforce that law against plaintiffs and because plaintiffs alleged "a direct effect on their day-to-day operations." *Whole Woman's Health*, 142 S. Ct. at 537.

Likewise, in *Kentucky v. Yellen*, states had standing to challenge a stimulus offset provision. 54 F.4th 325, 336–37 (6th Cir. 2022). The states intended to accept stimulus funds which triggered the provision, the provision arguably prohibited the states from cutting taxes post-acceptance, and the Treasury Department "intended to enforce" the provision. *Id.* The case became moot only after the department adopted a Final Rule disavowing the states' interpretation. *Id.* at 339.

The enforcement presumption applies here. Nelson is the object of the law, the law arguably prohibits her desired activities, and Louisville never disavows and actively enforces the law. Contrary to Louisville's suggestion, this presumption does not "collapse" arguable violation and credible threat. Metro.Br.20. Governments can still disprove a credible threat—even with an arguable violation—by authoritatively disavowing enforcement or establishing that the law is unused.

That's what happened in *Plunderbund Media, L.L.C. v. DeWine*, 753 F. App'x 362 (6th Cir. 2018). There, the court assumed an arguable violation but found no standing because the prosecutor disavowed enforcing the law against plaintiffs' political expression. *Id.* at 366, 372.

By contrast, Louisville triggers the presumption by admitting that the law prohibits Nelson's speech, never disavowing.

Even so, Louisville claims the law is not "targeted" at Nelson. Metro.Br.15, 18. But Louisville has repeatedly admitted that its law *applies* to Nelson's studio and regulates her photographs and blogs. *Supra* § I.A.2; Order, R.130, PageID#5360.

Most other courts agree that speakers like Nelson have standing to challenge laws like Louisville's. *N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 9–11 (1988) (standing "before any enforcement proceedings were initiated"); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1171–75 (10th Cir. 2021); *Telescope Media Grp. v. Lucero* (*TMG*), 936 F.3d 740, 749–50 (8th Cir. 2019); *Brush & Nib Studio, LC v. City of Phoenix* (*B&N*), 448 P.3d 890, 900–02 (Ariz. 2019); *Emilee Carpenter, LLC v. James*, 575 F. Supp. 3d 353, 365–70 (W.D.N.Y. 2021).

Louisville counters with a sole outlier: *Updegrove v. Herring*, an unpublished, out-of-circuit, district court case currently on appeal. No. 20-cv-1141, 2021 WL 1206805 (E.D. Va. Mar. 30, 2021). But that case turned on incorrect facts. Though the court thought the law had "never been enforced," *id.* at *3, Virginia later admitted that "certain statements" of non-enforcement "were not accurate" when made, Decl. of R. Thomas Payne, II ¶3, *Updegrove v. Herring*, No. 20-cv-01141-CMH-JFA (E.D. Va. May 27, 2021), ECF No. 66. And Louisville concedes here that it actively enforces its law.

Nelson need only prove a *credible* threat of enforcement. And Louisville's briefing, discovery responses, and witness testimony make that threat near certain. Nelson has standing.

### 4. Other factors support the enforcement presumption, bolstering Nelson's standing.

This Court need not evaluate the multi-factor test it sometimes uses to determine standing because the enforcement presumption applies. But Nelson meets those four factors anyway. Order, R.130, PageID#5359–5364. *See McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016) (listing four factors).

*First*, Louisville actively enforces the law. Answer ¶10, R.104–4, PageID#4591 (admitting complaint paragraph 303 that Louisville "actively investigates complaints"). Louisville stipulated that it investigated at least 100 discrimination complaints against public accommodations from 2010-2020. Stip. Fact, R.104–5, PageID#4649. Public records suggest that number is higher. Pls.' Combined MSJ Resp., R.104, PageID#4558 n.9. And Louisville investigated 173 sexual-orientation complaints from 2002–2020. Boyd Supp. Aff., R.39–1, PageID#1155. That's more than enough. *Cf. Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550–51 (6th Cir. 2021) (standing with two prior prosecutions).

*Second*, Louisville never disavows. *Supra* § I.A.2; Tr., R.52, PageID#1345 (Court: "you're not disavowing"; Louisville: "That's

27

right."). Louisville actively defends its authority to prosecute Nelson as a "compelling" interest. Metro.Br.34–40. And just after the district court's ruling, Louisville's then-Mayor publicly vowed to "continue to enforce to the fullest extent possible [the] ordinance prohibiting anti-discriminatory practices." Mayor Greg Fischer (@GregFischerLou), Twitter (Aug. 30, 2022, 6:55 PM), https://bit.ly/4011tJz.

Louisville's very legal theory makes disavowal impossible. Louisville does not tolerate even a single exemption. Metro.Br.36 ("every single instance of discrimination" undermines city's interests); Boyd Dep., R.92–7, PageID#3727 ("a single instance of discrimination" must "be corrected"). With this no-exceptions rule, a disavowal isn't forthcoming. Order, R.130, PageID#5361 (making this point).

*Third*, Louisville's law makes enforcement easy. Any "person" claiming to be aggrieved may file a complaint. Metro Ord. § 92.09(A). The law defines "person" broadly. *Id.* at § 92.02. Private testers and nonprofit organizations' testers can (and have) filed complaints. Case File, R.92–7, PageID#3772–3776 (Lexington Fair Housing Council's testers supported complaint); 30(b)(6) Dep., R.92–7, PageID#3648 (no policy stops private citizens from "engaging in testing activity").

Louisville counters that only "aggrieved" persons may complain. Metro.Br.15–16. That's hardly a limitation. *SBA List*, 573 U.S. at 164 (pre-enforcement standing though complainants needed "knowledge of the purported violation"). Any of the above "persons" could claim to be

aggrieved merely by seeing Nelson's statement and objecting to it without a specific service denial. *Infra* § I.A.5.[2]

Louisville even makes it easy to file complaints in person, by phone, or online. Goatley Dep., R.92–7, PageID#3735. Louisville posts its complaint form online "[t]o make it convenient for a person wanting to file a complaint to do so at their leisure." *Id*. Louisville modified the form so that persons can access it "on a computer or an iPad or a cell phone." *Id*. at PageID#3740; Online Form, R.92–7, PageID#3759; *Platt*, 769 F.3d at 452 (online complaint form bolstered standing).

Louisville's enforcement commission can also initiate its own complaints. Metro Ord. §§ 92.08(B)(4), 92.09(A). Recently, the commission filed a complaint against Scooter's Triple B's after "scrolling through social media" and seeing "controversial things." Boyd Dep., R.92–7, PageID#3662. And Louisville can file complaints through its testers, including against public accommodations. *Id*. at PageID#3645–3648; *id*. at PageID#3647 (testers test public accommodations). Louisville says these testers do not "materially impact" Nelson's standing. Metro.Br.16. Not so. These testers are another galaxy in the

---

[2] Advocacy organizations—like Lexington Fair Housing Council—can file complaints on their own behalf after seeing news reports. Case File, R.129–2, PageID#5306–5309, 5321, 5326–5331. Louisville also accepts complaints from councilman on behalf of their constituents. *Id*. at PageID#5046–5050.

"universe of *potential* complainants." *SBA List*, 573 U.S. at 164 (emphasis added); *TMG*, 936 F.3d at 750 (testers supported standing).

*Fourth*, Louisville consistently condemns Nelson's "specific conduct" as illegal. *McKay*, 823 F.3d at 869; *supra* § I.A.2. With that, no formal "warning letters" are necessary. *Contra* Metro.Br.15. *See Peoples Rts. Org., Inc. v. City of Columbus*, 152 F.3d 522, 529 (6th Cir. 1998) (standing where city's answer stated its "inten[t] to prosecute anyone who violates the … ordinance"); *Mich. State Chamber of Com. v. Austin*, 788 F.2d 1178, 1184 (6th Cir. 1986) (similar).

Nelson checks all the pre-enforcement factors. But she only needed "some combination" of them. *McKay*, 823 F.3d at 869. That justifies standing many times over.

### 5. Louisville's counterarguments impose unnecessary barriers and make standing impossible.

While ignoring the above admissions, undisputed facts, and precedent, Louisville says that Nelson must first be "asked to provide services for a same-sex wedding." Metro.Br.16. But that forces Nelson to violate the law before challenging it. Courts do not ask plaintiffs to take that gamble. *E.g.*, *303 Creative LLC*, 6 F.4th at 1171–75 (standing without considering prior request); *TMG*, 936 F.3d at 749–50 (same). Regardless, a request is irrelevant for four reasons.

30

*First*, Nelson's policy and statement violate the law. *Supra* § I.A.2. Louisville allows anyone who sees an objectionable sign or policy—or hears about it in the news—to complain even if they are not denied a service. Boyd Dep., R.92–7, PageID#3716, 3718.[3]

*Second*, Louisville only restricts Nelson's desired statements under the *Publication Provision* because Louisville claims they propose an activity the *Accommodations Provision* prohibits. Metro.Br.40–41. Put differently, the Publication Provision depends on the Accommodation Provision's definition of illegal activities. That intertwinement gives Nelson standing to challenge both provisions. For example, in *FEC v. Cruz*, a senator could challenge the law and its implementing regulations because the regulations could not "operate independently of" the law and were "expressly promulgated to implement" the law. 142 S. Ct. at 1649. So too here.

*Third*, Louisville's enforcement commission prosecutes without service denials. Louisville launched a complaint against Scooter's Triple B's because of social media's reaction to the sign without knowledge of

_____

[3] The Lexington Fair Housing Council filed a public-accommodations complaint against Teen Challenge of Kentucky after someone from the organization saw news reports describing the ministry's views on homosexuality. Case File, R.129–2, PageID#5321, 5326–5345. The organization filed the complaint without alleging a "specific instance" of someone being denied a service. *Id.* at PageID#5306–5307, 5332.

an actual denial. 30(b)(6) and Boyd Deps., R.92–7, PageID#3663, 3724–3729.[4]

*Finally*, Louisville's enforcement commission members can initiate complaints and Louisville employs testers. *See* 30(b)(6) Dep., R. 92–7, PageID#3645. Louisville doesn't disavow doing so against Nelson. *Supra* § I.A.4.

Under any scenario, Louisville must investigate the complaint, harming Nelson. Metro Ord. § 92.09(C)–(D). That makes enforcement credible.

Those enforcement mechanisms and Nelson's actions distinguish this case from *Hyman v. City of Louisville*, 53 F. App'x 740 (6th Cir. 2002). There, the physician did not have "an immediate or projected need to hire a new employee." *Id.* at 744. Here, Nelson already adopted her policy and posted her statement. That exposes her to prosecution absent an injunction. *Hyman*'s "known in the community" phrase doesn't apply either. *Id.* Louisville prosecuted Scooter's Triple B's *because* its sign generated social-media attention, and anyone can file complaints against Nelson if they see her website statements.

Louisville's other arguments fail too. Louisville says "[n]o discrimination complaints have been filed" against her. Metro.Br.14. No matter. Nelson need not "first expose" herself to "prosecution" to challenge

---

[4] *See* Case File, R.129–1, PageID#5268–5305 (adding details).

Louisville's law. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). *Accord MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007).

Next, Louisville claims never to have "heard of Nelson" before this lawsuit. Metro.Br.14. But Louisville regularly investigates and prosecutes businesses it has never heard of before. Boyd Dep., R.92–7, PageID#3729–3730 (admitting no prior knowledge of Scooter's Triple B's); Goatley Dep., R.92–7, PageID#3741 (testers "randomly call[] places … they've never heard of before"). And citizens need not tip off hostile officials before they litigate to protect their constitutional rights.

Finally, Louisville insists that its law has "modest civil fines" and lacks criminal penalties. Metro.Br.18. But these fines are far from modest; Louisville settled one sexual-orientation complaint for $23,000, Report, R.92–7, PageID#3368, a steep price for free speech. And, as Louisville admits, "criminal penalties are not essential to confer pre-enforcement standing." Metro.Br.18; *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014) (recognizing same). Louisville's argument also ignores its law's other severe penalties. Order, R.130, PageID#5360–5361, 5393. The law's investigatory process alone harms Nelson and supports her standing. *Id.*; *SBA List*, 573 U.S. at 164 (standing for similar administrative system). [5]

---

[5] Teen Challenge submitted to Louisville's investigation, hired an attorney, responded, and decided against renovating a building (out of "concern[] about a fairness complaint") all in reaction to a complaint—

The district court correctly held it had jurisdiction to hear Nelson's claims.

## B.    Nelson brings ripe challenges to Louisville's law because it undisputedly forbids her desired activities.

Nelson's claims are also ripe for largely the same reasons she faces a credible enforcement threat. Order, R.130, PageID#5364–5365; *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (combining standing and ripeness analysis).

Louisville never disputes the ripeness of Nelson's facial or as-applied challenges to the Publication Provision or her Accommodations Provision challenge for banning her editorial policy. Metro.Br.22. That makes sense. Louisville agrees that Nelson's statements and policy violate the law, and facial challenges present purely legal questions. *See* § I.A.2; § VIII. Those claims are ripe.

Louisville focuses instead on Nelson's Accommodations Provision challenge for boutique editing and wedding-celebration services, complaining of missing facts about the requested service (photography, editing, and blogging), the reasons for Nelson's decline, and the nature of the ceremony. Metro.Br.22.

But Louisville's admissions and the detailed record provide more than enough facts. For three years, Louisville has argued its law

---

even though Teen Challenge was later vindicated. Case File, R.129–2, PageID#5308–5316, 5339–5340, 5346–5352.

34

requires Nelson to photograph, edit, and blog about same-sex weddings because she does so for opposite-sex weddings. *Supra* § I.A.2. Nelson cannot create the former because *every wedding photograph and blog she creates* celebrates and positively depicts that wedding. Nelson Decl. ¶151, R.92–2, PageID#2848. So Nelson cannot create *any photograph or blog* celebrating same-sex wedding ceremonies because that conveys a message she objects to—regardless of whether it has religious themes or not, *contra* Metro.Br.22. Louisville and its amici say that violates the Accommodations Provision. *See* § I.A.2; ACLU.Br.6–9; AU.Br.17–23; KYHR.Br.19–24.

That presents a sharp, concrete, and resolvable conflict. *See FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 459–60 (2007) (ripe claim where sample campaign advertisement violated the law). This Court should address the merits.

## II.  The Accommodations Provision violates the First Amendment by compelling Nelson to speak against her convictions.

The district court correctly held that Louisville's law compels Nelson to speak messages against her conscience. Order, R.130, PageID#5366–5377. Louisville (A) compels Nelson to speak; (B) based on content and viewpoint; (C) with no valid counterarguments; and (D) offers a no-limits legal theory while Nelson provides time-tested lines.

### A.    The Accommodations Provision alters Nelson's speech when she makes editorial decisions.

The First Amendment protects speakers' "autonomy to choose the content of [their] own message." *Hurley*, 515 U.S. at 573. Louisville's law violates this principle in the most "demeaning" way—by forcing Nelson to "endorse ideas [she] find[s] objectionable." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018). The law compels Nelson's speech because (1) her photographs and blogs are expressive, and (2) the law forces Nelson to create photographs and blogs that affect her expression. *Hurley*, 515 U.S. at 572–73 (applying this test); *Sistrunk v. City of Strongsville*, 99 F.3d 194, 199 (6th Cir. 1996) (same as to rally).

### 1.    Nelson's photographs and blogs are pure speech.

Nelson's photographs, boutique editing, and blogs are pure speech. *E.g.*, *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 924 (6th Cir. 2003) (protected expression includes "words" and "photographs"). They "communicate ideas" about marriage. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011). Through her expression, Nelson tells uplifting stories celebrating and promoting her view of God's design for marriage. Nelson Decl. ¶¶208–327, R.92–2, PageID#2854–2872. Each photograph, edit, and word contributes to this message. *Id.* (explaining artistic process); Nelson Dep., R.92–7, PageID#3306–3324. For that reason, the First Amendment protects Nelson's creative process just the same as

the final work. *Brown*, 564 U.S. at 792 n.1 (protections apply equally to "creating, distributing, or consuming speech").

The following photographs and blogs illustrate Nelson's expression. *See* Nelson's Photographs and Blog, R.92–5-6, PageID#2937–3005, 3029–3180.

*Photographs*



*Blogs*

> There were so many beautiful, thought-out details that it's hard to pick favorites, but I must say their unity cross was a wonderful way to honor their coming together.

> I can't wait to see how the Lord uses them as a married couple!

### 2.    Louisville's law affects Nelson's speech by forcing her to speak against her conscience.

The Accommodations Provision forces Nelson to change her message. Nelson celebrates opposite-sex weddings consistent with her religious beliefs. Nelson Decl. ¶¶75–99, R.92–2, PageID#2841–2844. Louisville's law requires her to celebrate same-sex weddings contrary to those beliefs. *Supra* § I.A.2. This compulsion affects the content of Nelson's speech by forcing her to create and promote a message she disagrees with, violating Nelson's "autonomy" to choose the content of her expression. *Hurley*, 515 U.S. at 573. Practically, this means Louisville forbids Nelson from following her policy of only celebrating weddings according to her faith. *Supra* § I.A.2.

Louisville counters that its law does not force Nelson to photograph "in any particular way," apply "a certain style," dictate "how Nelson takes photographs," or require her to promote same-sex weddings "in a positive and uplifting way." Metro.Br.23, 28. But the public-accommodations law in *Hurley* did not facially orchestrate the

parade's route or the floats' color, size, or shape. The law still compelled speech because its application altered the parade's message.

Likewise here, Louisville conceded that Nelson must provide exactly the same services for opposite-sex and same-sex weddings. *Supra* § I.A.2. Nelson always portrays opposite-sex weddings "in a positive and uplifting way." Nelson Decl. ¶151, R.92–2, PageID#2848. Louisville thus forces her to do the same to celebrate same-sex weddings. Metro.Br.28 (Nelson's services must be "equally available to all customers"); *Id.* at 34 (same). But photographs and blogs celebrating same-sex weddings express a different message from those celebrating opposite-sex marriage. Compare Nelson's photographs on the left with other photographers' images on the right. *Compare* Nelson's Photographs and Blogs, R.92–5-6, PageID#2937–3005, 3029–3180 *with* Louisville Photographers' Photographs and Blogs, R.92–7, PageID#3448–3488, 3519–3556, 3569–3632.

 






The same goes for Nelson's wedding blogs. Nelson's posts exalting a mother's relief over the "wonderful young man" marrying her daughter and congratulating the "husband and wife" or "bride and groom" say one thing. Nelson's Photographs and Blogs, R.92–5-6, PageID#2973, 2949, 2998. Other photographers' posts criticizing "heteronormative attitudes" about marriage and congratulating "the grooms" and "Mr. and Mr." say something altogether different.

40

Louisville Photographers' Blogs and Photographs, R.92-7, PageID#3540, 3601, 3631.

Louisville compels Nelson's speech more egregiously than other compelled speech cases. The *Hurley* parade organizers objected to a single nine-word banner in a mass of 10,000 participants. 515 U.S. at 561, 570. And in *Hurley*, *Miami Herald Publishing Company v. Tornillo*, 418 U.S. 241 (1974), *Wooley v. Maynard*, 430 U.S. 705 (1977), and *Pacific Gas & Electric Company v. Public Utilities Commission of California* (*PG&E*), 475 U.S. 1 (1986), the speakers had to include someone else's views—produced by someone else—in their expression. Even so, the applications of those laws still violated the First Amendment. Louisville's law goes much further by requiring Nelson to *originate expression* that violates her faith and then post photographs and congratulatory blogs on her own website.

### B.    The Accommodations Provision violates the First Amendment by compelling Nelson to speak based on content and viewpoint.

Worse, Louisville applies the Accommodations Provision to Nelson in a content- and viewpoint-based manner. Order, R.130, PageID#5374–5377.

A law is content based if it "applies to particular speech because of the topic discussed or … message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A viewpoint-based law regulates speech

41

because of the "particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Louisville's law does both. The *content* of Nelson's message sets off the law, and its *viewpoint* determines its legality.

Louisville counters that the law does not facially "draw[] distinctions based on content." Metro.Br.28. But the district court rightly rejected this argument. Order, R.130, Page#5375. As applied, the law regulates the content and viewpoint of Nelson's expression in three ways.

*First*, the law compels Nelson to photograph and blog about same-sex marriage. That "necessarily alters the content" of Nelson's speech and changes her desired message about marriage. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988).

*Second*, the law treats Nelson's "choice to talk about" opposite-sex marriage "as a trigger for compelling" her to celebrate same-sex marriage. *TMG*, 936 F.3d at 753; *see Tornillo*, 418 U.S. at 256. Louisville contends *Tornillo*'s triggering point is inapplicable because Nelson's decision to offer services—not her speech—triggers the law. Metro.Br.34. But the newspaper could have avoided the right-of-reply statute by never publishing any op-eds. The paper's *decision* to publish triggered the statute. So too here. Louisville admits that Nelson's *decision* to celebrate opposite-sex weddings triggers her obligation to celebrate same-sex weddings. *Id.* So *Tornillo*'s logic applies.

*Third*, the law awards access to Nelson's photographs and blogs "only to those who disagree[] with [her] views" on marriage. *PG&E*, 475 U.S. at 13. Nelson must accept all same-sex wedding requests because Louisville considers any refusals to be "inextricable" from "sexual orientation" discrimination. Metro.Br.31.

In these ways, the law *applies* based on the content of Nelson's expression and her viewpoint.

## C. Louisville's approach unsettles established law protecting speaker autonomy.

Contrary to Louisville's suggestions, the law compels Nelson's speech—(1) not her conduct; (2) not speech incidental to conduct; (3) not her client's speech; and (4) not her client selection.

### 1. The Accommodations Provision compels Nelson's speech, not her conduct.

Louisville says its law only compels sales, not speech. Metro.Br.23. But Nelson does not object to *who* she sells to. *Infra* § II.C.4. She only objects to *what* she photographs and blogs about. As applied to Nelson, then, Louisville's law compels access to the content of Nelson's custom photographs and blogs. *Supra* § I.A.2; Order, R.130, PageID#5376. This case is about speech, not sales.

*Hurley* proves the point. The public-accommodation law there did not target speech "on its face" but applied in a "peculiar way" to the parade organizers' "speech itself" by forcing them to "alter" the parade's

43

"expressive content." 515 U.S. at 572–73. Other courts adopt this logic to prevent facially neutral anti-discrimination laws from applying to interfere with speech. *See Groswirt v. Columbus Dispatch*, No. 00-3451, 2000 WL 1871696, at \*2 (6th Cir. 2000); *Johari v. Ohio State Lantern*, No. 95-3421, 1996 WL 33230, at \*1 (6th Cir. 1996).[6]

That logic necessitates the same result here. Louisville's law requires Nelson to create photographs and blogs celebrating same-sex weddings. That application is unconstitutional.

Put differently, although Louisville's law typically and facially targets conduct, its application "alter[s]" Nelson's "expressive content," *Hurley*, 515 U.S. at 572–73, and is "trigger[ed]" by Nelson "communicating a message," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). For that reason, cases about license plates and the Pledge of Allegiance apply even though Louisville's law generally regulates the sale of non-expressive goods. *Contra* Metro.Br.33–34. The law applies here to force Nelson to speak a message—like the compulsions for the driver and the students.

Louisville tries to distinguish *Hurley* by claiming "[a] same-sex couple's wedding is not *Nelson's* parade." Metro.Br.32. But Louisville's

[6] *E.g.*, *Green v. Miss United States of Am., LLC*, 52 F.4th 773 (9th Cir. 2022); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247 (11th Cir. 2021); *TMG*, 936 F.3d at 752; *B&N*, 448 P.3d at 914; *City of Cleveland v. Nation of Islam*, 922 F. Supp. 56 (N.D. Ohio 1995).

law doesn't regulate the couple's wedding. It regulates Nelson's *photographs and blogs about the wedding*. And that—just like *Hurley*'s parade—is her speech.

Trying again, Louisville argues *Hurley* involved a "private" parade. Metro.Br.31–32. But a state court found that the parade was so unselective it was a public accommodation as a matter of state law. *Hurley*, 515 U.S. at 564.

Nor did Nelson waive her First Amendment rights by choosing to open her studio "to the public" for a commission. Metro.Br.34–35, 39. The *Hurley* parade charged a participant fee. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos. v. City of Bos.*, 636 N.E.2d 1293, 1298 n.13 (Mass. 1994). And selling "expressive materials" doesn't diminish constitutional protections. *ETW Corp.*, 332 F.3d at 925.

In the end, *Hurley*—and the many cases applying *Hurley* in this context—control here. That precedent proves Louisville's law regulates Nelson's speech as applied to her photographs and blogs.

### 2. The Accommodations Provision directly burdens Nelson's speech.

Louisville invokes *Rumsfeld v. Forum for Acad. & Institutional Rts.* (*FAIR*), 547 U.S. 47 (2006), to say any burden on Nelson's speech is "incidental." Metro.Br.31. That's incorrect.

In *FAIR*, law schools had to host military recruiters in classrooms. 547 U.S. at 61–62. That involved conduct because the schools didn't

speak when they hosted. *Id.* at 64–65. As a result of the non-expressive hosting requirement, the schools also had to send factual emails. *Id.* at 61–62. Those emails were "plainly incidental to the Solomon Amendment's regulation of conduct"—i.e., room access. *Id.* at 62.

Here, the law regulates only speech—the *content* of Nelson's photographs and blogs. Order, R.130, PageID#5369–5371. There is no conduct this speech is incidental to. That in turn treats "speech itself" as the public accommodation. *Hurley*, 515 U.S. at 572–73.

*FAIR* explains why this case is different. *FAIR* distinguished compelling access to non-expressive property (like empty rooms) from compelling access to speech (like parades and newspapers). 547 U.S. at 63. Under *FAIR*, equal-access rules are unconstitutional when they "affect[]" speech or "interfere[] with a speaker's desired message." *Id.* at 63–64. Louisville's law does that here. So *FAIR* supports Nelson.

These principles distinguish Louisville's other cases too. Some involved conduct—like selling hamburgers or renting rooms. Metro.Br.24. Others involved situations when the law didn't affect the defendant's expression—like membership organizations, law firms, and schools. Metro.Br.24–26. Louisville's best case is *Elane Photography, LLC v. Willock*. But that case ignored how the law altered photographs—not just sales—and conflicts with *Hurley*, *FAIR*, and many other cases. The district court rightly rejected that case. Order, R.130, PageID#5367–5369.

46

### 3. The Accommodations Provision compels Nelson's speech, not her clients'.

Louisville next counters that Nelson's photographs and blogs are not *her* speech, but the speech of "the couple being married." Metro.Br.26. Wrong. Nelson retains "ultimate editorial judgment and control" over her photographs and blogs. Contracts, R.92–6, PageID#3018, 3026. And she makes independent decisions about how best to portray the couple. Nelson Decl. ¶¶208–325, R.92–2, PageID#2854–2872.

This creative control makes it irrelevant that Nelson collaborates with others. The First Amendment protects "[p]ublishers disseminating the work of others." *ETW Corp.*, 332 F.3d at 925. The "Pulitzer … goes to the photographer, not her subjects." Order, R.130, PageID#5367. And Nelson's expression is hers—even if it depicts or describes others. The First Amendment protects biographers and autobiographers alike.

Nor does Nelson's right to speak turn on whether the public would think Nelson "endors[es]" any same-sex wedding Louisville forced her to photograph. Metro.Br.26. For example, drivers, newspapers, and utility companies cannot be forced to promote speech easily attributable to others. *PG&E*, 475 U.S. at 907 (compelled speech when outside speaker had to "state that its messages are not those of appellant"); *Wooley*, 430 U.S. at 715; *Tornillo*, 418 U.S. at 258.

Although irrelevant, third-party perceptions support Nelson's argument. Louisville's Executive Director testified that Nelson's

wedding photographs "communicate[] a message of celebration."
Goatley Dep., R.92–7, PageID#3755. Nelson posts those photographs *on her blog*, writes uplifting messages *on her blog*, and tags each post with "Chelsey Nelson." Nelson Decl. ¶¶188–90, R.92–2, PageID#2852. The public would perceive Nelson's same-sex wedding photographs and blogs as celebrating those weddings.

### 4. The Accommodations Provision compels Nelson's speech, not her client selection.

Louisville stresses that its law regulates *who* can buy products, not *what* businesses sell. Metro.Br.23. In that vein, Louisville says Nelson must create works promoting same-sex weddings because "refusing to sell based on an attribute inextricable from a customer's protected characteristic is discriminatory." Metro.Br.31. But that's not happening here. Nelson objects to creating messages, not selling products.

Nelson creates photographs and blogs that celebrate opposite-sex marriage consistent with her faith. She would create and sell those works *to anyone*, including LGBT photographers for boutique editing or LGBT wedding planners or parents requesting photographs an opposite-sex wedding. Nelson Decl. ¶¶396–409, R.92–2, PageID#2880–2882. She merely declines to create photographs and blogs that contradict her faith. *Id.* at ¶¶332–76, PageID#2872–2878. And she would decline to create those works for anyone. That's equal treatment.

Louisville agrees—for other topics. For example, Louisville allows businesses to decline to create or sell goods they have never made in the past. Goatley Dep., R.92–7, PageID#3751 (testifying t-shirt designer could decline "God bless gay marriage" shirt unless it already "had that template").[7] Nelson has never created same-sex wedding photography or blogs in the past for anyone. But Louisville treats Nelson worse by forcing her to change her speech in the future.

Louisville refuses to acknowledge that status discrimination "is not the same as disagreement with a message." Order, R.130, PageID#5376. The First Amendment protects the latter. That was *Hurley*'s point. The parade could decline parade access to disfavored messages when it did not exclude "homosexuals as such" from the parade. 515 U.S. at 572, 574–75. Nelson is no different. She opposes ideas, not people.

---

[7] A bulk-sale tire shop declined to sell a small number of tires to a customer because the sale "did not coincide with [its] business model." Case File, R.119–3, PageID#4973–4979. And a physician referred a same-sex couple to another office because he did not specialize in the requested medical services. *Id*. at PageID#5058–5064. Louisville found that neither violated the law.

**D.    Nelson's lines are workable; Louisville's line suppresses speech.**

Nelson's two-part test—drawn from *Hurley*—provides workable boundaries for determining when public-accommodation laws compel speech. Louisville's test obliterates free speech.

Under *Hurley*, there must first be speech. Louisville claims that this requirement is "unworkable." Metro.Br.37. But the line is clear here. *Supra* § II.A.1. In most cases, speech will clearly "communicate ideas" and resemble other protected mediums. *Brown*, 564 U.S. at 790. In unclear cases, courts consider whether an activity "is intended to be communicative" and whether it would be objectively "understood by the viewer to be communicative." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) (citations omitted). Either way, courts have "long drawn" this speech/conduct "line." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2373 (2018).

Another limit is that the speech must be custom created, not pre-made. *See Associated Press v. United States*, 326 U.S. 1, 20 n.18 (1945) (distinguishing refusal to sell completed product from refusal to create and publish). Selling pre-made items doesn't infringe the conscience like creating custom expression that contradicts one's beliefs.

Next, if there's custom speech, the law must affect the speaker's message. The speaker's stated objections, the requested speech's facial content, its context, and whether the speaker otherwise serves the protected class are relevant to that inquiry. *Hurley*, 515 U.S. at 570,

572–74; *Sistrunk*, 99 F.3d at 199 (considering similar facts when Republican rally excluded Democratic buttons). None of that is disputed here, and it all favors Nelson's freedom of expression.

This framework does not undermine the general legitimacy of public-accommodations laws. *E.g.*, Order, R.130, PageID#5354–5355. Those laws can stop status-based discriminatory conduct. But they cannot compel the creation of custom speech.

Meanwhile, Louisville's theory brings a sledgehammer to fix something more suited for an x-acto knife. Louisville claims the authority to regulate the custom expression of any public accommodation. Metro.Br.24. But Louisville broadly defines public accommodations to include those that "advertise[] on the Internet." Defs.' MPI Resp., R.15–1, PageID#772. And the law applies regardless of corporate form. 30(b)(6) Dep., R.92–7, PageID#3666.[8]

Louisville admits that under its theory, newspapers must run ads with objectionable words, and speechwriters must lend their voices to causes they oppose. 30(b)(6) Dep., R.92–7, PageID#3674; Tr., R.52, PageID#1402–1404.[9] Under the same logic, an LGBT-owned t-shirt

---

[8] *See also* Case File, R.119–3, PageID#4961–4972 (applying law to newspaper and private Catholic school).

[9] Louisville doesn't ban political ideology discrimination, ACLU.Br.9, but nothing prevents it from adding that later as other cities in this circuit have done, *see* Eugene Volokh, *Bans on Political Discrimination in Places of Public Accommodation and Housing*, 15 NYU J.L. & Liberty 490, 493–94, 496 (2022) (collecting Michigan examples).

company must create "Defend Marriage" shirts for pro- *and* anti-*Obergefell* rallies. And cake artists who *support* same-sex marriage must design cakes *criticizing* same-sex marriage. *Cf. Mannarino v. Cut the Cake Bakery*, No. 16–3465, 2017 WL 601408 (Fl. Div. of Admin. Hr'gs Feb. 9, 2017). That's nonsensical.

Nelson's approach is better—safeguard free speech while allowing the government to prosecute discriminatory conduct. That approach gives full effect to the First Amendment by protecting both Nelson's expression *and* those who might disagree.

### III. The Publication Provision violates the First Amendment by restricting Nelson's speech about protected activities based on content and viewpoint.

The Publication Provision restricts Nelson's speech based on content and viewpoint. Order, R.130, Page#5387–5390.

Louisville never challenges the district court's holding. Louisville just retreads old ground, saying it can restrict Nelson's speech as "an illegal policy of discrimination." Metro.Br.40. But Nelson has a constitutional right to photograph and blog about only those messages consistent with her faith. *Supra* § II. She therefore has the intertwined right to publicly explain her choice. Order, R.130, PageID#5387–5388 (explaining this point); Order, R.47, PageID#1222–1223 (same).

This logic does not undermine laws banning speech about *illegal* and *constitutionally unprotected* activities in housing, employment, or

public accommodations. *Contra* Metro.Br.40. Louisville's law does the opposite here: banning speech about *legal* and constitutionally *protected* activities. Louisville can no more ban Nelson's statements than it can forbid parade organizers from posting a statement declining objectionable floats. *TMG*, 936 F.3d at 757 n.5 (making similar point).

Shifting gears, Louisville suggests that its law doesn't restrict Nelson's speech because she can publish *some* of her religious beliefs. Metro.Br.3, 29. But limited speech isn't free speech. *See Wis. Right To Life*, 551 U.S. at 477 n.9 (collecting cases). Nelson has a right to post her "comprehensive" views on marriage how she wants. Nelson Decl. ¶¶445–54, R.92–2, PageID#2886–2887.

## IV.    The Accommodations and Publication Provisions violate KRFRA because they substantially burden Nelson's religious beliefs.

Louisville's law also infringes Nelson's KRFRA rights. KRFRA protects (1) the "right to act or refuse to act" on a "sincerely held religious belief," from (2) being "substantially burdened" by the government, unless (3) the government can show the burden passes strict scrutiny. K.R.S. § 446.350. Nelson meets the first two elements; Louisville fails the third.

Nelson is religiously and sincerely motivated to create photographs and blogs celebrating her view that marriage is the union of one man and one woman, to bind her studio to that policy, and to publicly

explain the reasons for this decision. Nelson Decl. ¶¶328–409, 441–54, R.92–2, PageID#2872–2882, 2886–2887.

Louisville's law burdens these beliefs by "assessing penalties" against Nelson. K.R.S. § 446.350. The law threatens her with fines and other penalties if she creates photographs, writes blogs, or posts statements consistent with her faith. Order, R.130, PageID#5393 (listing some of these penalties). These penalties force Nelson to create photographs and blogs that violate her beliefs. And Louisville's law has already burdened Nelson by forcing her to refrain from religious speech before the injunction to avoid prosecution. Nelson Decl. ¶¶439–454, R.92–2, PageID#2885–2887. By any definition, these are substantial burdens. Order, R.130, PageID#5393; *B&N*, 448 P.3d at 920.

Louisville denies any burden on Nelson because she sued before prosecution. Metro.Br.42. But this Court grants pre-enforcement RFRA injunctions. *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 616 (6th Cir. 2020) (per curiam) (KRFRA); *Doster*, 54 F.4th at 416–26 (RFRA). The imminent choice facing Nelson—between violating the law and following her faith—proves a substantial burden. *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013) (making this point).

Louisville also defends its law as targeting Nelson's business practices, not her "religious observance." Metro.Br.42. That argument misunderstands Nelson's religious exercise. Nelson operates her studio as an extension of her faith—i.e., as a form of religious observance.

Nelson Decl. ¶¶75–99, R.92–2, PageID#2841–2844. KRFRA ensures she can do so penalty-free. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 703 (2014) (protecting business's decision to operate "in accordance with the family's religious beliefs").

Louisville faults the district court for not conducting a "separate strict scrutiny analysis." Metro.Br.43. But First Amendment and KRFRA claims use the same strict-scrutiny test. *See Maryville Baptist Church*, 957 F.3d at 613 (applying traditional strict scrutiny test to KRFRA claim). In its strict-scrutiny analysis, the district court considered and rejected Louisville's claim of third-party harms. Order, R.130, PageID#5377–5387; *contra* Metro.Br.43–44. Having done so for the First Amendment, the court need not repeat itself.

## V.    Louisville's law fails strict scrutiny as applied to Nelson.

Louisville's law violates Nelson's rights by compelling her to express messages that violate her conscience. Louisville has no historical evidence of public-accommodations laws ever being used this way. That alone undermines any need to apply its law to regulate Nelson's speech. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022) (articulating this historical test).

But at a minimum, strict scrutiny applies. *See PG&E*, 475 U.S. at 19 (applying strict scrutiny to compelled speech); *Reed*, 576 U.S. at 163 (same for content- and viewpoint-based speech regulations); K.R.S.

§ 446.350 (KRFRA). And Louisville cannot meet its burden to show how applying its law here (A) serves a compelling interest, or (B) is narrowly tailored to that interest.

### A. Louisville lacks a compelling interest in applying its law to Nelson's speech.

Louisville has no compelling interest in applying its law here. Louisville instead says "[a]ll agree that" Louisville's interests are compelling. Metro.Br.35. But "broadly formulated interests" don't suffice. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021). Strict scrutiny "demands a more precise analysis." *Id.*

Louisville must have a compelling interest in regulating—and denying an exemption for—*Nelson's* speech. *Id.*; *see Wis. Right To Life*, 551 U.S. at 477–78 ("[A] compelling interest [must] support[] *each application* of a statute restricting speech."). Once the avowed interest is properly narrowed, governments lack a compelling interest in applying their anti-discrimination laws to compel speech. *Hurley*, 515 U.S. at 578; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659–61 (2000); *supra* § II.C.1 n.6 (collecting cases).

Continuing generalities, Louisville asserts an interest in "rooting out all forms of discrimination." Defs.' Interrogatory Resp., R.92–7, PageID#3295. But that interest dead-ends here. Nelson does not discriminate—she declines messages, not people. *Supra* § II.C.4.

Louisville's law just regulates Nelson's speech. The law serves no "legitimate end" by doing that. *Hurley*, 515 U.S. at 578.

Next, Louisville argues that compelling access to Nelson's photographs and blogs is necessary to ensure "equal access." Metro.Br.35. But Louisville never established access to same-sex wedding photography was "an actual problem in need of solving." *Brown*, 564 U.S. at 799 (cleaned up). Far from it. Many photographers in Louisville and members of the Fair Event Vendors Alliance photograph and post blogs promoting same-sex weddings. Louisville Photographer Deps. and Exs., R.92–7, PageID#3436–3613. Louisville knows of no example in which someone lacked access to same-sex wedding photography before passing its law or before (or after) Nelson's injunction. Defs.' Admissions, R.92–7, PageID#3290; Deps., R.92–7, PageID#3680, 3752, 3754.

Louisville also cites the need to prevent dignitary harms. Metro.Br.36–37. But Nelson has countervailing dignity interests. *Cohen v. California*, 403 U.S. 15, 24 (1971) (free speech partly "premise[d]" on "individual dignity" of speaker). And dignity harms have never justified speech regulations. Order, R.130, PageID#5375.

The law is underinclusive as to that interest anyway. Louisville allows sex-discrimination in most contexts, and people may "shout from [the] rooftop" that same-sex marriage "is immoral [and] abhorrent." Metro Ord. § 92.05(C); Metro.Br.30. Other exemptions further undermine Louisville's claimed interests. *Brown*, 564 U.S. at 802

(underinclusivity "is alone enough" to defeat law). Louisville's exemptions in housing, employment, and public accommodations render the law fatally underinclusive. Order, R.130, PageID#5382.

Louisville argues that these exemptions in *other laws* are irrelevant. Metro.Br.36. But that overlooks how the *public-accommodations law* has a massive exemption for sex discrimination. Metro Ord. § 92.05(C). Louisville only prohibits hotels, restaurants, and government-funded business from engaging in sex discrimination. *Id.* All other public accommodations can do so without penalty. *See id.* § 92.05(A).[10]

And what matters is an exemption's effect, not location. *Brown*, 564 U.S. at 802 (law regulating violent video games was underinclusive when no laws regulated similarly violent cartoons, games, and books); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 545 (1993) (city ordinance regulating meat disposal underinclusive when *state* law contained exemptions). The effects of Louisville's many exemptions undermine its interests in "rooting out all" discrimination. So the law is underinclusive and therefore fails strict scrutiny.

---

[10] *See* Case Files, R.119–3, PageID#4980–4983 (dismissing sex discrimination claim for lack of jurisdiction); *id.* at PageID#5065–5072 (same for disability discrimination claim); *id.* at PageID#5038–5045, 5051–5057 (dismissing gender-identity claims despite assertions that complainants felt humiliated).

### B.    Louisville has many, less intrusive alternatives to achieve any valid goal.

Louisville's law also fails strict scrutiny because it lacks narrow tailoring. Regulating Nelson's speech is not "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

Louisville must "prove that [proposed] alternative[s] will be ineffective to achieve its goals." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). To do that, Louisville needed to present evidence that it "seriously undertook to address the problem with less intrusive tools readily available to it," *McCullen v. Coakley*, 573 U.S. 464, 494 (2014), *before passing the ordinance*, *Playboy Ent. Grp., Inc.*, 529 U.S. at 822 (speech-restricting law failed narrowly tailoring with "near barren legislative record"). Louisville admitted it failed to do so: the city has no "information regarding what alternative measures th[e] legislators may have considered." Defs.' Interrogatories, R.104–4, PageID#4647–4648. That's decisive.

Equally decisive is that Louisville never considered less restrictive practices of other jurisdictions. *Ramirez v. Collier*, 142 S. Ct. 1264, 1279–80 (2022) (requiring this); *McCullen*, 573 U.S. at 491–94 (same). Those jurisdictions show that many better alternatives exist. Order, R.130, PageID#5380–5381.

For example, at least 20 states apply their public-accommodations laws to stop actual status discrimination, not message-based objections.

Utah Code Ann. § 34A-5-111; Br. of Ariz. et al. as Amici Curiae in Supp. of Pet'rs, *303 Creative LLC v. Elenis*, No. 21-476, 2022 WL 2066544 (U.S. June 2, 2022). They do so without a problem.

Louisville claims that exempting message-based objections would be "unworkable" and "difficult." Metro.Br.37. But this it-might-be-hard argument "is not enough to satisfy the First Amendment." *McCullen*, 573 U.S. at 495. The lines are workable anyway. *Supra* § II.D.

In fact, Louisville already draws First Amendment lines in housing discrimination claims and with laws regulating sexually oriented businesses, child curfews, and drop-off bins. FHAP Contract, R.104–4, PageID#4645 (housing); Metro Ord. §§ 111.01(K)(1) (businesses); 137.03(C) (curfews); 156.052(L)(7) (bins). There's no reason Louisville cannot apply a similar exemption to Nelson. Professor Barak-Corren's testimony doesn't prove otherwise. *Infra* § VI.

Next, Louisville could exempt individuals and small business that celebrate weddings. *See* Miss. Code § 11-62-5(5)(a). Louisville argues this could raise other constitutional issues. But the district court properly rejected that argument. Order, R.130, PageID#5381.

Finally, Louisville could define public accommodations limited to essential, non-expressive, or brick-and-mortar businesses. *See* 42 U.S.C. § 2000a(b) (narrowly defining public accommodations); Fla. Stat. § 760.02(11) (same). Louisville does this for sex-based classifications

without issues. Metro Ord. § 92.05(C). Louisville has many options to achieve its goal without compelling or restricting Nelson's speech.

## VI.  Professor Barak-Corren's testimony was properly excluded.

The district court did not abuse its discretion by excluding Professor Barak-Corren's testimony. Expert evidence must have "a reliable foundation" and be "relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Her testimony fails both requirements.

Barak-Corren tried to evaluate the effects of religious exemptions on artists' willingness to provide services for same-sex weddings. Report, R.91–1, PageID#2614, 2637. She centered her study on the Supreme Court's *Masterpiece* decision because she anticipated extensive media coverage. *Id.* Before the decision, Barak-Corren emailed wedding professionals from fictitious same-sex couples (Wave 1) and then from fictitious opposite-sex couples (Wave 2). *Id.* at PageID#2652, 2680, 2694–2695; Appendix, R.90–5, PageID#2379–2388. After the decision, Barak-Corren sent two more waves of email inquiries to the same professionals (Waves 3 and 4). Report, R.91–1, PageID#2647. She then compared response rates to same-sex inquiries before and after *Masterpiece*, claimed to have found an increase in non-responses or explicit declines to same-sex inquiries after *Masterpiece*, and concluded that *Masterpiece* caused this decline. Metro.Br.39.

61

Problems abound. Barak-Corren's testimony is (A) not reliable because she makes a causal argument without causal evidence and many other errors invalidate her conclusions. Barak-Corren's testimony is also (B) not legally relevant because she has no information about how her findings—even if true—would apply *to Nelson in Louisville*, as required for strict scrutiny.

### A.    Barak-Corren's testimony is unreliable because her study contains structural mistakes.

Contrary to Louisville's suggestion, the district court didn't quibble with Barak-Corren's methodology. *Contra* Metro.Br.45. The court found that her many methodological missteps rendered her testimony unreliable. Order, R.130, PageID#5384–5385. That's the district court's role. Fed. R. Evid. 702 advisory committee's note, 2000 amend ("[A]ny step that renders the analysis unreliable ... renders the expert's testimony inadmissible."). The court was right for three reasons.

*First*, Barak-Corren never investigated whether the professionals she surveyed knew about the *Masterpiece* decision. Barak-Corren Dep., R.90–7, PageID#2459–2460. She instead relied on (i) what the media said about *Masterpiece*, and (ii) what people understood the opinion to say based on those media reports. Report, R.90–3, PageID#2292–2295, 2315–2317 & n.151 (relying on media for "expressive theory of law"); Barak-Corren Dep., R.90–7, PageID#2474. But as Louisville admits, "it

was not possible to examine what media sources the vendors consumed before or after the *Masterpiece* decision." Metro.Br.49.

In other words, Barak-Corren argues that *Masterpiece* caused a result. Metro.Br.39 (summarizing Barak-Corren's conclusion). But Barak-Corren has no evidence that professionals even knew about— much less were influenced—by *Masterpiece*. That's like saying a flat tire caused an accident without knowing—or having any evidence support- ing—whether the tire was flat. Without knowledge about the cause, Barak-Corren's flat-tire-like claim is unreliable.

The Supreme Court likewise rejected an expert's testimony about "exposure to violent video games and harmful effects on children." *Brown*, 564 U.S. at 800. The testimony at best showed correlation, which didn't establish causation. *Id.* Without causation, the state had no interest banning the video games. *Id.* Barak-Corren's testimony fails for the same reason.

Louisville tries to repair Barak-Corren's testimony, saying *other* studies show that Supreme Court decisions shape public opinion. Metro.Br.50. But those studies recorded subjects' awareness of those particular decisions. Pls.' Mot. to Exclude and Reply, R.90, R.106, PageID#2231–2232, 4664–4465. Even Tankard and Paluck (Metro.Br.50) asked subjects about their media consumption, and most participants reported daily consumption. Tankard & Paluck, R.90–9,

PageID#2494. Barak-Corren doesn't even know *how often* professionals saw *any* news.

Louisville next argues that *Masterpiece*'s nuances—meaning that the Court did not grant a religious exemption—are irrelevant because the case was "broadly reported and understood as a victory." Metro.Br.50. But mainstream, progressive, and conservative media reported on the case differently. Report, R.91–1, PageID#2637–2640. Mainstream and progressive outlets described the case critically or narrowly—i.e., not granting an exemption. *Id.* Barak-Corren never measured who saw what, which media type was more widely consumed, or whether the artists who declined viewed mainstream, progressive, conservative, or no media at all. That makes it impossible to know whether *Masterpiece* was generally "understood" as a narrow or wrong case or a religious-exemption case. Louisville's contrary argument—that "narrow" reporting supports Barak-Corren, Metro.Br.50—just assumes the unfounded premise of a *Masterpiece* reaction.

*Second*, the study contains a structural flaw. Before *Masterpiece*, many more professionals responded to same-sex inquiries in Wave 1 (70.8% response rate) compared to opposite-sex inquiries in Wave 2 (58.7% response rate). Report, R.90–3, PageID#2304. Barak-Corren admits this feature prevented her from knowing "the extent of discrimination towards same-sex couples … before *Masterpiece*." Barak-Corren Dep., R.90–7, PageID#2464–2465. That tanks the study. The

study purports to do a before-and-after comparison. But that comparison is impossible without a "before" baseline.

Barak-Corren tried some workarounds, but none suffice. Pls.' Reply Mot. to Exclude, R.106, PageID#4667–4671. One issue is that Barak-Corren never accounts for regression to the mean—the phenomenon where extreme results retreat to their average when re-tested. *Id.* Since Wave 1 had such a high response rate, it's likely that regression to the mean explains any reduced responsiveness. Creighton Meland & Stephen Cranney, *Measuring and Evaluating Public Responses to Religious Rights Rulings*, 23 Fed. Soc'y Rev. 333, 342–44 (2022). That's statistics; not discrimination.

*Finally*, Barak-Corren's testimony suffers from several other defects that make her conclusions unreliable. Yancey Report ¶¶10–33, R.90–6, PageID#2416–2429; Order, R.130, PageID#5385 n.13. The study contained enough errors to occupy an entire law review article. Meland & Cranney, 23 Fed. Soc'y Rev. at 333–54.

Taking these errors together or viewing them independently, the district court properly excluded Barak-Corren's testimony as unreliable.

### B.  Barak-Corren's testimony is legally irrelevant because she has no information about Nelson or Louisville.

The district court also correctly found Barak-Corren's testimony legally irrelevant to the strict-scrutiny analysis.

The court found Barak-Corren had no "special insight into" narrow tailoring. Order, R.130, PageID#5386 (cleaned up). If anything, the court noted, Barak-Corren's report actually "highlight[ed] the Ordinance's underinclusivity." *Id.* While Barak-Corren touted the widespread harms of one exemption, Louisville's law already permits many. *Id.* Louisville never engages this logic.

Barak-Corren's strict-scrutiny analysis is also irrelevant for another reason: she fails to specifically analyze Nelson's *requested exemptions in Louisville* as strict scrutiny demands. *Supra* § V.A.

For example, Barak-Corren designed her study around religious exemptions. But she never mentions how her analysis would change for a message-based exemption—like the one involved in this case. In fact, she testified that a message-based objection to celebrating same-sex weddings would be a nondiscriminatory response: a cake artist "intending to provide shelf products but having a First Amendment objection to providing a custom product" would be coded as a "positive baker." Barak-Corren Dep., R.90–7, PageID#2475.

Barak-Corren also never audited artists in Louisville, never explained how lower-courts' decisions affect social norms as compared to Supreme Court decisions, and never reliably compared Louisville to the studied states. Mot. to Exclude, R.90, PageID#2243, 2249–2250. Nor did she compare Nelson's media attention to *Masterpiece*'s, rendering any inferences about public reaction to Nelson's case entirely speculative.

The actual evidence is that Louisville is unaware of any increase in sexual-orientation complaints since Nelson's injunctions. *See* Deps., R.92–7, PageID#3680, 3752, 3754. Louisville cannot rebut the admissions of its own officials.

Barak-Corren did not even establish widespread objections to celebrating same-sex weddings. Barak-Corren contacted approximately 2,000 creative professionals inquiring about same-sex wedding services *and only one* declined because the professional "only does traditional weddings." Appendix, R.90–5, PageID#2391, 2397 (recording 177 phone calls and 906 emails times two waves); Barak-Corren Dep., R.90–7, PageID#2476. That equals an explicit decline rate of .00051% (1/1,977). That cannot be enough to override Nelson's rights.

The district court also pointed out the backward consequences of Barak-Corren's argument. Under her logic, *Masterpiece* should have tolerated Colorado's hostility towards Jack Phillips—comparing his to beliefs to Holocaust defenders and treating him worse than other secular artists, 138 S. Ct. at 1729–31—to avoid the speculative possibility that the media would misreport the case, the public would misunderstand the ruling, and artists would mistakenly discriminate more based on their incorrect understanding of a court opinion. Order, R.130, PageID#5386. What's more, lower court judges would be forced to tailor their constitutional decisions to account for speculative public perceptions. *Id.* Louisville never disputes these consequences.

The First Amendment stands as a bulwark against public reactions or perceptions. Barak-Corren cannot cabin constitutional protections to popular opinions. Her testimony was properly excluded.

## VII.  The supplemental documents are admissible, undisputed, and further bolster Nelson's standing and claims.

This Court should consider Nelson's supplemental records. The district court denied Nelson's motion to supplement as "moot" because it ruled in her favor without relying on these records. Text Order, R.131. The court never concluded the records were inadmissible; it just didn't rely on them. This Court reviews mootness-based evidentiary decisions de novo. *Cf. Cleveland Mun. Sch. Dist.*, 455 F.3d at 698 (applying "de novo" review to district court's decision to decline to admit certain reports after finding the reports became moot because of prior ruling).

Several other considerations support de novo review. For example, appellate courts "conduct an independent examination of the record as a whole" for First Amendment claims like Nelson's. *Hurley*, 515 U.S. at 567. Next, appellate courts may review summary-judgment evidence disregarded—but not excluded—by lower courts. Fed. R. Civ. P. 56(c)(3) (courts "may consider other [uncited] materials in the record"). The supplemental documents are also judicially noticeable, and judicial notice may be taken "at any stage of the proceeding." Fed. R. Evid. 201(d). Lastly, this Court has discretionary authority to supplement the appellate record and can do so here because the supplemental

documents meet the relevant factors. *United States v. Murdock*, 398 F.3d 491, 500 (6th Cir. 2005).

Applying de novo review, this Court should consider Nelson's supplemental documents. Louisville never disputes their accuracy or authenticity. And these documents contain new evidence that reinforce Nelson's arguments. They are relevant to her standing (nn.2–5), her compelled speech claim (n.7), the consequences of Louisville's logic (n.8), strict scrutiny (n.10), and her facial challenge (§ VIII).

## VIII. The Unwelcome Clause facially violates the First and Fourteenth Amendments.

The Unwelcome Clause bans speech that indicates someone's "patronage of, or presence at" a public accommodation "is objectionable, unwelcome, unacceptable, or undesirable." Metro Ord. § 92.05(B). This language is overbroad, vague, and grants unbridled discretion to Louisville officials.

The district court largely agreed, calling the clause "troubling" and "incompatibl[e] with the First Amendment." Order, R.130, PageID#5388. But the court declined to facially enjoin it. The court believed it granted Nelson's requested relief by enjoining the Unwelcome Clause as applied to her, and the court questioned facially enjoining an ordinance on a pre-enforcement record. *Id.* The court's reservations were misguided.

69

Courts often enjoin laws that facially violate the First Amendment to reduce the risk of the society-wide chilling effect affecting *others*. *E.g.*, *Gooding v. Wilson*, 405 U.S. 518, 520 (1972). And courts invalidate laws in "pre-enforcement facial constitutional challenges" because they "present purely legal issues." *Hill v. Snyder*, 878 F.3d 193, 213–14 (6th Cir. 2017) (cleaned up and collecting cases). Following these cases, this Court should address the merits of Nelson's facial challenge. The merits prove the Unwelcome Clause is facially unconstitutional.

## A.    The Unwelcome Clause is overbroad.

Courts walk a two-step path to resolve overbreadth claims. First, they "construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008). Then, they determine whether that construction regulates "a substantial amount of protected expressive activity." *Id.* at 297. If it does, the law is overbroad.

For step one, the Publication Provision has two clauses: the Denial Clause and the Unwelcome Clause. The Denial Clause prohibits written statements indicating that services "will be refused, withheld, or denied" to individuals because of protected traits. Metro Ord. § 92.05(B). These terms prohibit public accommodations from making statements that a service will be "actually refused, withheld or denied because of that person's protected class." Boyd Dep., R.92–7, PageID#3715.

The Unwelcome Clause prohibits public accommodations from publishing statements indicating that a prospective customer is "objectionable, unwelcome, unacceptable, or undesirable" because of a protected characteristic. Metro Ord. § 92.05(B). Louisville neither defines "objectionable, unwelcome, unacceptable, or undesirable" nor offers enforcement guidance. Boyd Dep., R.92–7, PageID#3716–3717. But under the canon against surplusage—a rule which gives effect to each word in a statute and presumes that different words have different meanings —the Unwelcome Clause must mean something different from the Denial Clause. Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) (describing canon).[11]

But what could the Unwelcome Clause proscribe that's different from the denials banned by the Denial Clause?

Louisville provided an answer when it prosecuted Scooter's Triple B's for posting the following sign. Case File, R.129–1, PageID#5268–5301; Dep. Ex., R.92–7, PageID#3690.

---

[11] This Court and Kentucky use this rule. *E.g.*, *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 257 (6th Cir. 2020); *City of Lebanon v. Goodin*, 436 S.W.3d 505, 513 (Ky. 2014).



Louisville argued that it could ban the sign under the Unwelcome Clause to "protect its citizens from unwanted exposure to certain methods of expression" and to silence "communications which may cause negative secondary effects the city wishes to prevent." Case File, R.129–1, PageID#5274, 5277, 5279. *Accord* Boyd Dep., R.92–7, PageID#3725. With that reading, the Unwelcome Clause covers almost *any* critical utterance related to *any* protected trait.

Under overbreadth's second step, the Unwelcome Clause's plain terms render the clause hopelessly oppressive. Many courts have invalidated laws with similar language. *See Gooding*, 405 U.S. at 519,

528 (invalidating overbroad law prohibiting "opprobrious words or abusive language"); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (Alito, J.) (same as to harassment policy involving "any unwelcome verbal" conduct). *Cf. Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 577–78 (6th Cir. 2013) (ban on advertisements that "discourage" certain protected classes would be overbroad). It is easy to see why.

As the district court observed, the Unwelcome Clause gives Louisville "unrestrained authority to police speech based on subjective listener reactions." Order, R.130, PageID#5389–5390. A business's pro-Israel or pro-Palestine sign? An All Lives Matter window decal? A physician's op-ed criticizing cross-sex hormones? All forbidden by the Unwelcome Clause to avoid imagined secondary effects based on national origin, race, or gender identity status. *See 303 Creative LLC*, 6 F.4th at 1213–14 (Tymkovich, C.J., dissenting) (collecting examples).

Louisville's "secondary effects" gloss makes matters worse. Scooter's Triple B's argued that its sign contained constitutionally-protect speech because it expressed the owners' "opinion" on "the issue of access to restrooms by transgender individuals"—a "contentious" issue involving "a matter of public concern." Case File, R.129–1, PageID#5292–93.

Louisville agreed the sign was "political speech" on "a highly controversial political" topic. *Id.* at PageID#5276–5277. But Louisville

73

then turned the First Amendment upside down. Rather than crediting these factors as reasons to *protect* the speech, Louisville counted them as reasons to *restrict* the speech. To Louisville, the contentiousness of the debate transformed the restaurant's speech into "fighting words" and made it *more likely* that negative "secondary effects" might occur. *Id.* at PageID#5276–5277.

That bans too much for no reason. After all, speech on "controversial subjects" normally "occupies the highest rung" of First Amendment protection. *Janus*, 138 S. Ct. at 2476. By banning speech on these topics, the Unwelcome Clause is irredeemably overbroad.

## B.    The Unwelcome Clause is vague and grants Louisville's officials unbridled enforcement discretion

The void-for-vagueness doctrine guards against vague and standardless laws. A law is vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (cleaned up). A law is standardless—i.e., grants unbridled discretion—if its lack of guidance "authorizes or encourages seriously discriminatory enforcement." *Id.*

The Unwelcome Clause is vague for the same reasons it is overbroad. *Supra* § VIII.A; *see Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (noting "vagueness and overbreadth [are] logically related and similar doctrines"). Other judges have reached the same conclusion about nearly identical laws. *See Brush & Nib Studio, LC v. City of*

*Phoenix*, 418 P.3d 426, 442–43 (Ariz. Ct. App. 2018) (striking nearly identical words); *303 Creative LLC*, 6 F.4th at 1213–14 (Tymkovich, C.J., dissenting) (explaining how same words were vague and overbroad).

The Unwelcome Clause is so unclear that Louisville officials don't even agree on it. The former Executive Director referred the sign for prosecution for potentially violating the clause while the current Executive Director said she "probably wouldn't have paid [the sign] no attention." *Compare* Boyd Dep., R.92–7, PageID#3720–3721, 3724–3725, 3731 *with* Goatley Dep., R.92–7, PageID#3749, 3766.

That disagreement reinforces the Unwelcome Clause's vagueness and lack of enforcement standards. For these reasons, it should be facially enjoined.

## IX. Nelson's nominal and compensatory damages should be reinstated because she plausibly alleged harm.

Nelson also deserves nominal and compensatory damages because Louisville's ordinance caused her to self-censor to avoid prosecution. The district court dismissed this relief. In its view, Nelson failed to establish a causal connection between the ordinance and "the chilling effect and the lost business" and didn't show how nominal damages "might redress past chill." Order, R.47, PageID#1211–1212.

But Nelson alleged that she refrained from posting statements expressing how her religious beliefs influenced her artistic policies,

limited her advertisements, refused to respond to photography editing requests posted in an online forum, and lost business opportunities. Compl. ¶¶234–59, R.1, PageID#30–33. She did all of that *because of* Louisville's law. *Id.* These allegations must be accepted as true and construed in Nelson's favor because the court dismissed these claims at the motion-to-dismiss stage. *E.g.*, *McGlone*, 681 F.3d at 731.

Meanwhile, Nelson's decision to refrain from those activities was objectively reasonable given the threats she faced. *Supra* § I (detailing her threats); Order, R.47, PageID#1209–1211.

Nelson's self-censorship lasted until the court granted her preliminary injunction. That chill caused injuries—lost constitutional freedoms and business opportunities. Nominal and compensatory damages redress those injuries. *E.g.*, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (holding "nominal damages" redress "a completed violation of a legal right"); *Barilla v. City of Houston*, 13 F.4th 427, 430 (5th Cir. 2021) (reinstating pre-enforcement nominal damages); *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801 (7th Cir. 2016) (awarding pre-enforcement nominal damages); *Benson v. City of Wellston*, 201 F. App'x 350, 352–54 (6th Cir. 2006) (compensating company for lost profits caused by city's retaliation for company's political speech).

In holding otherwise, the district court invoked *Morrison v. Board of Education of Boyd County*, 521 F.3d 602 (6th Cir. 2008). But there,

the plaintiff self-chilled with no realistic danger of violating the challenged policy. The policy did not apply to the kind of speech the student hoped to proclaim; nor did the student offer any evidence to show the school would punish him for his proposed speech. *Id.* at 610. In that scenario, there was not an "actual injury" for nominal damages to redress. *Id.* at 610–11.

By contrast, Nelson encountered a credible threat each day she operates her studio before the injunctions. *Supra* § I. That threat caused her to chill her speech. And even a dollar redresses that harm. *Uzuegbunam*, 141 S. Ct. at 802.

*Morrison*'s nominal-damages analysis—which the district court relied on—is also no longer good law. *Morrison* said that nominal damages only bring about relief as "to future dealings between the parties." 521 F.3d at 611 (cleaned up). After the school changed the policy, *Morrison* reasoned, nominal damages couldn't alter the parties' future rights. *Id.*

But the Supreme Court recently rejected the argument that nominal damages only redress "continuing or threatened injury." *Uzuegbunam*, 141 S. Ct. at 798. After reviewing the historical record, the Court held that nominal damages redress completed, past constitutional violations. *Id.* at 798, 801–02. Likewise here, nominal damages redress Nelson's self-censorship caused by Louisville's law.

Louisville's law violated Nelson's constitutional rights and caused her injuries. So this Court should reinstate Nelson's damages and remand to the district court to enter nominal damages in Nelson's favor and calculate compensatory damages.

## CONCLUSION

Nelson only wants the freedom to choose what she says, not who she serves. The First Amendment and KRFRA protect that choice. Louisville has no legitimate reason to deny Nelson that freedom. Louisville never challenges the scope of the injunction or declaratory relief—only its merits. But Nelson wins on the merits and Louisville thus waived any scope-related objections. This Court should affirm the injunction and declaratory relief, consider the supplemental materials, facially enjoin the Unwelcome Clause, and reinstate Nelson's damages.

Dated: February 22, 2023

Respectfully submitted,

s/John J. Bursch

JOHN J. BURSCH
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

JONATHAN A. SCRUGGS
BRYAN D. NEIHART
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
bneihart@ADFlegal.org

*Attorneys for Plaintiffs-Appellees/Cross-Appellants*

**FRAP 32(g)**

**CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 15,299 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R.32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: February 22, 2023

*s/John J. Bursch*
John J. Bursch

*Attorney for Plaintiffs-Appellees/Cross-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/John J. Bursch*
John J. Bursch

*Attorney for Plaintiffs-Appellees/Cross-Appellants*

**ADDENDUM**

## DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rules 28(b)(1)(A)(i) and 30(g), Plaintiffs-Appellees/Cross-Appellants designate the following district court documents as relevant:

| Record Entry | Description | Page ID # Range |
|:---:|:---|:---:|
| 1 | Plaintiffs' Complaint | 1–53 |
| 1–2 | Exhibit 1 to Complaint—Chilled Wedding Celebration Services Statement | 57–58 |
| 1–3 | Exhibit 2 to Complaint–Chilled Boutique Editing Services Statement | 59–60 |
| 3–4 | Appendix to Preliminary Injunction Motion, Website Before Injunction | 170–182 |
| 14–1 | Defendants' Memorandum in Support of Motion to Dismiss Plaintiffs' Claims | 731–749 |
| 15–1 | Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction | 765–793 |
| 33 | Plaintiffs' Response to Defendants' Motion to Dismiss | 986–1021 |
| 38 | United States' Statement of Interest in Support of Plaintiffs' Motion for a Preliminary Injunction | 1120–1142 |

| 39 | Defendants' Reply to Plaintiffs' Response to Motion to Dismiss Plaintiffs' Claims | 1143–1153 |
| 39–1 | Supplemental Affidavit of Kendall Boyd | 1154–1156 |
| 47 | Memorandum Opinion and Order | 1202–1228 |
| 52 | Transcript of Preliminary Injunction Hearing, August 7, 2020 | 1337–1427 |
| 64 | Defendants' Motion for Protective Order | 1608–1623 |
| 64–3 | Exhibit 3 to Defendants' Motion for Protective Order, Affidavit of Verná Goatley | 1649–1654 |
| 89 | Memorandum Opinion and Order | 2186–2219 |
| 90 | Plaintiffs' Motion to Exclude Testimony of Netta Barak-Corren | 2220–2252 |
| 90–2 | Exhibit A to Motion to Exclude, Professor Netta Barak-Corren's Report | 2258–2267 |
| 90–3 | Exhibit B to Motion to Exclude, Professor Netta Barak-Corren's Paper #1 | 2269–2331 |
| 90–4 | Exhibit C to Motion to Exclude, Professor Netta Barak-Corren's Paper #2 | 2332–2377 |

| 90–5 | Exhibit D to Motion to Exclude, Professor Netta Barak-Corren's Online Appendix | 2378–2410 |
|---|---|---|
| 90–6 | Exhibit E to Motion to Exclude, Rebuttal Expert Report of George Yancey, Ph.D. | 2411–2440 |
| 90–7 | Exhibit F to Motion to Exclude, Professor Netta Barak-Corren's Deposition Excerpts | 2451–2477 |
| 90–8 | Exhibit G to Motion to Exclude, *The Supreme Court, the Media, and Public Opinion: Comparing Experimental and Observational Methods* Excerpts | 2478–2489 |
| 90–9 | Exhibit H to Motion to Exclude, *The Effect of a Supreme Court Decision Regarding Gay Marriage on Social Norms and Personal Attitudes* Excerpts | 2490–2494 |
| 90–10 | Exhibit I to Motion to Exclude, *Backlash or a Positive Response? Public Opinion of LGB Issues after* Obergefell v. Hodges Excerpts | 2495–2500 |
| 90–11 | Exhibit J to Motion to Exclude, *Same-Sex Marriage Legalization Associated with Reduced Implicit and Explicit Antigay Bias* Excerpts | 2501–2504 |
| 90–17 | Exhibit P to Motion to Exclude, *The Regression Fallacy* | 2560–2568 |

| 90–18 | Exhibit Q to Motion to Exclude, *Correcting for Regression to the Mean in Behavior and Ecology* | 2569–2577 |
|---|---|---|
| 92 | Plaintiffs' Summary Judgment Motion | 2793–2798 |
| 92–1 | Plaintiffs' Brief in Support of Their Summary Judgment Motion | 2799–2832 |
| 92–2 | Chelsey Nelson's Declaration in Support of Plaintiffs' Summary Judgment Motion | 2833–2895 |
| 92–3 | Bryan D. Neihart's Declaration in Support of Plaintiffs' Summary Judgment Motion | 2896–2901 |
| 92–4 | Table of Contents: Appendix to Plaintiffs' Brief in Support of Plaintiffs' Summary Judgment Motion | 2902–2905 |
| 92–5 | Part I of Appendix to Plaintiffs' Summary Judgment Motion | 2906–2974 |
| 92–6 | Part II of Appendix to Plaintiffs' Summary Judgment Motion | 2975–3232 |
| 92–7 | Part III of Appendix to Plaintiffs' Summary Judgment Motion | 3233–3797 |
| 96 | Defendants' Cross-Motion for Summary Judgment | 3809–3812 |
| 97 | Defendants' Combined Response to Plaintiffs' Motion for Summary Judgment and Memorandum in Support of | 3813–3846 |

| | | |
|---|---|---|
| | Defendants' Cross-Motion for Summary Judgment | |
| 97–7 | Exhibit 7 to Defendants' Summary Judgment Motion, Chelsey Nelson Deposition Excerpts | 3966–4002 |
| 104 | Plaintiffs' Combined Response to Defendants' Cross Motion for Summary Judgment and Reply in Support of Their Summary Judgment Motion | 4536–4582 |
| 104–1 | Chelsey Nelson's Declaration in Support of Plaintiffs' Combined Response to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Their Summary Judgment Motion | 4583–4585 |
| 104–2 | Bryan D. Neihart's Declaration in Support of Plaintiffs' Combined Response to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Their Summary Judgment Motion | 4586–4588 |
| 104–3 | Continued Table of Contents: Appendix to Plaintiffs' Brief in Support of Plaintiffs' Summary Judgment Motion | 4589 |
| 104–4 | Part IV of Appendix to Plaintiffs' Summary Judgment Motion | 4590–4648 |
| 104–5 | Statement of Stipulated Fact | 4649–4652 |

| 106 | Plaintiffs' Reply in Support of Their Motion to Exclude Testimony of Netta Barak-Corren | 4658–4678 |
|---|---|---|
| 106–1 | Bryan D. Neihart's Supplemental Declaration in Support of Plaintiffs' Motion to Exclude Testimony of Netta Barak-Corren | 4679–4681 |
| 106–3 | Exhibit S to Motion to Exclude, *Does the Sophomore Slump Really Exist?* | 4707–4727 |
| 111 | Defendants' Reply in Support of Defendants' Cross-Motion for Summary Judgment | 4777–4805 |
| 119 | Plaintiffs' Motion to Supplement the Summary Judgment Record or Take Judicial Notice | 4920–4944 |
| 119–1 | Bryan D. Neihart's Declaration in Support of Plaintiffs' Motion to Supplement the Summary Judgment Record or to Take Judicial Notice | 4945–4948 |
| 119–3 | Supplemental Appendix to Plaintiffs' Summary Judgment Motion, Case Files | 4961–5122 |
| 120 | Defendants' Response to Plaintiffs' Motion to | 5124–5129 |

| | Supplement Summary Judgment Record or to Take Judicial Notice | |
|---|---|---|
| 127 | Memorandum Opinion and Order | 5181–5206 |
| 129 | Defendants' Notice of Compliance with Memorandum and Order Dated June 2, 2022 | 5266–5267 |
| 129–1 | Supplemental Appendix to Plaintiffs' Summary Judgment Motion, Scooter's Triple B's Unredacted Case File | 5268–5305 |
| 129–2 | Supplemental Appendix to Plaintiffs' Summary Judgment Motion, Teen Challenge of Kentucky, Inc.'s Unredacted Case File | 5306–5352 |
| 130 | Opinion & Order | 5353–5396 |
| 131 | Text Order | N/A |
| 132 | Judgment | 5397 |
| 134 | Defendants' Notice of Appeal | 5403–5405 |
| 137 | Plaintiffs' Notice of Cross-Appeal | 5409–5411 |